

JUDGE RAKOFF

DAVIS & GILBERT LLP
Neal H. Klausner
nklausner@dglaw.com
James R. Levine
jlevine@dglaw.com
1740 Broadway
New York, NY 10019
(212) 468-4800
*Attorneys for Plaintiff Conopco, Inc.*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONOPCO, INC.

                   Plaintiff,

    -against-

PHOENIX BRANDS LLC,

                 Defendant.

---

**COMPLAINT**

Plaintiff Conopco, Inc. ("Plaintiff" or "Conopco"), for its claims against Defendant Phoenix Brands LLC ("Defendant" or "Phoenix"), alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from Phoenix's failure to pay Conopco amounts invoiced and owed for services rendered pursuant to a Transitional Services Agreement dated January 5, 2004 (the "Transitional Services Agreement"). A copy of the Transitional Services Agreement is attached hereto as Exhibit A. Copies of the relevant invoices are attached hereto as Exhibit B. Phoenix's actions give rise to a claim for breach of contract – or in the alternative, unjust enrichment – and a claim for account stated.

## PARTIES

2.      Plaintiff Conopco is a corporation organized under the laws of the State of New York, with its principal place of business at 700 Sylvan Avenue, Englewood Cliffs, NJ 07632.

3.      Upon information and belief, Defendant Phoenix is a company organized under the laws of the State of Delaware, with its principal place of business at 300 Atlantic Street, Stamford, CT 06901.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) this Court has personal jurisdiction over the Defendant in this action; and (b) the Transitional Services Agreement that is the subject of this action provides that the parties irrevocably agree that any legal action arising out of or in connection with the Agreement or the transactions contemplated thereby or disputes relating thereto (whether for breach of contract, tortious conduct, or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York if such Court has subject matter jurisdiction, and that the parties irrevocably accept and submit to the exclusive jurisdiction and venue of such Court *in personam*.

## FACTUAL ALLEGATIONS

6.      Conopco, directly or indirectly through its affiliates, is in the business of manufacturing, marketing, distributing and/or selling numerous brands of consumer products, including without limitation food products, home care products, and personal care products.

7.      Pursuant to an Asset Purchase Agreement dated December 6, 2003 (the "Asset Purchase Agreement"), Conopco directly and through certain of its affiliates sold to Phoenix several businesses related to brands of fabric treatment, fabric care, fabric conditioning and dish detergent products (the "Businesses") – including accompanying assets, including without limitation real property, leaseholds, intellectual property, permits, licenses, contracts, accounting records, raw materials, supplies, finished products, equipment, furniture and vehicles.

8.      In connection with the transaction set forth in the Asset Purchase Agreement, on or about January 5, 2004, Conopco and Phoenix entered into the Transitional Services Agreement.  Under the Transitional Services Agreement, Conopco agreed to provide, or use commercially reasonable best efforts to cause one or more of its affiliates to provide, various services to Phoenix.

9.      The services to be provided pursuant to the Transitional Services Agreement included services associated with the supply of certain products, as well as other services including without limitation those related to production planning and quality assurance, transport and warehousing of products, managing of sales force, handling and tracking of customer orders, forecasting, quality assurance, shipping, customer service and credit/collection matters, accounting, and information systems.

10.     In consideration for the various services to be provided under the Transitional Services Agreement, Phoenix agreed to pay Conopco various fees.

11.     Among the services that Conopco agreed to provide pursuant to the Transitional Services Agreement were the "Korex Services", whereby Conopco would cause Korex Don Valley ULC ("Korex") to manufacture certain products.  Phoenix agreed to purchase such products pursuant to a pricing schedule set forth in the Transitional Services Agreement.

12.     The Transitional Services Agreement entitled Conopco to charge Phoenix for adjustments reflecting changes in Conopco's cost of providing the Korex Services (the "Purchase Price Variances").

13.     The Transitional Services Agreement also required Phoenix, upon expiration or earlier termination of that Agreement or any of the Services thereunder, to purchase from Conopco, at Conopco's actual cost, all completed products, existing ingredients, raw materials and other supplies produced or purchased by Conopco and held at third-party manufacturers in the ordinary course of business, to the extent that Phoenix had not previously paid for such items (the "Inventory Transfer").

14.     Another service that Conopco agreed to provide pursuant to the Transitional Services Agreement was the collection and processing of all receivables from customers. This service included (a) collecting payments from the customers and remitting those payments related to post-closing sales to Phoenix, (b) processing amounts deducted by customers from their invoices for reasons such as damage to products (the "Customer Trade Deductions"), and (c) invoicing Phoenix for the amount of such Customer Trade Deductions related to post-closing sales. Under the Transitional Services Agreement, Phoenix was responsible for Customer Trade Deductions relating to post-closing sales, since the revenues resulting from such sales flowed to Phoenix.

15.     Pursuant to the Transitional Services Agreement, Conopco was entitled to and did charge Phoenix for the amount of the post-closing Customer Trade Deductions.

16.     Between May 2005 and March 2008, Conopco's designated affiliate Unilever Canada Inc. invoiced Phoenix for fees for services provided pursuant to the Transitional Services Agreement, including without limitation the Korex Services. The charges on such invoices

4

included without limitation Purchase Price Variances. The amount outstanding for such services provided to Phoenix is approximately C$645,928.17 (Canadian Dollars). Phoenix did not object to such charges within a reasonable time after receiving the invoices. Phoenix has failed and refused to pay any of this sum.

17.    In April 2005, Conopco's designated affiliate Unilever Canada Inc. invoiced Phoenix for approximately C$1,103,683.17 for Inventory Transfer costs pursuant to the Transitional Services Agreement. Phoenix objected only to certain of these charges, which resulted in discussions between the parties. The parties ultimately agreed to a downward adjustment of C$182,529.58 to the amount due and owing by Phoenix for Inventory Transfer Costs. Conopco demanded that Phoenix pay the remaining C$921,153.59.

18.    Phoenix did not object to the adjusted balance of C$921,153.59 for Inventory Transfer costs within a reasonable time. Phoenix has failed and refused to pay any of this sum.

19.    Between April 2005 and August 2005, pursuant to the Transitional Services Agreement, Conopco's designated affiliate Unilever Canada Inc. invoiced Phoenix for approximately C$729,834.44 for Customer Trade Deductions taken on sale revenue already remitted to Phoenix. Phoenix objected only to certain of these charges, which resulted in discussions between the parties. The parties ultimately agreed to a downward adjustment of C$12,708.51 to the amount due and owing by Phoenix for Customer Trade Deductions. Conopco demanded that Phoenix pay the remaining C$717,125.93.

20.    Phoenix did not object to the adjusted balance of C$717,125.93 for Customer Trade Deductions within a reasonable time. Phoenix has failed and refused to pay any of this sum.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

21.     Conopco repeats and realleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

22.     Conopco duly performed all of the terms of the Transitional Services Agreement on its part to be performed.

23.     Phoenix accepted and used Conopco's services that were provided pursuant to the terms of the Transitional Services Agreement.

24.     Despite Conopco's repeated demands, Phoenix has failed and refused to pay Conopco money owed to it pursuant to the Transitional Services Agreement.

25.     As a result of Phoenix's breach of the Transitional Services Agreement, Conopco has sustained damages in an amount to be determined at trial, but not less than C$2,284,207.69, plus interest, which sum Conopco has demanded of Phoenix and which sum Phoenix has failed and refused to pay.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment, Pled in the Alternative)

26.     Conopco repeats and realleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

27.     By reason of the foregoing, in the alternative, Phoenix has been unjustly enriched, in that Phoenix has received and accepted services and inventory from Conopco for which Phoenix has wrongfully refused to pay.

28.     Conopco reasonably expected to be paid for these services and inventory.

6

29.    In equity and in good conscience, it would be unjust and inequitable to permit Phoenix to enrich itself at Conopco's expense and to retain the benefits conferred due to its inequitable conduct.

30.    Conopco is entitled to restitution from Phoenix in the amount by which Phoenix has been unjustly enriched.

31.    Phoenix has been unjustly enriched at the expense of Conopco in an amount not less than C$2,284,207.69, plus interest, which sum Conopco has demanded of Phoenix and which sum Phoenix has failed and refused to pay.

**THIRD CAUSE OF ACTION**
**(Account Stated)**

32.    Conopco repeats and realleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

33.    Conopco's designated affiliate has transmitted to Phoenix invoices for fees for services provided pursuant to the Transitional Services Agreement, including without limitation the Korex Services, reflecting a balance of C$645,928.17.  Phoenix received and retained such invoices and did not object to such charges within a reasonable time, thereby assenting to their accuracy.

34.    Conopco's designated affiliate has transmitted to Phoenix invoices for fees for Inventory Transfers and Customer Trade Deductions.  After Conopco made the downward adjustments of C$182,529.58 with respect to Inventory Transfers and C$12,708.51 with respect to Customer Trade Deductions, in accordance with the parties' prior discussions, Conopco

transmitted a statement of Phoenix's account reflecting the adjusted balances of C$921,153.59 for Inventory Transfer costs and C$717,125.93 for Customer Trade Deductions.

35.    Phoenix received and retained the statement of its account and did not object to the adjusted balances within a reasonable time, thereby assenting to their accuracy.

36.    By virtue of the foregoing, Phoenix is liable to Conopco on an account stated for C$2,284,207.69, plus interest.

**WHEREFORE**, Plaintiff Conopco prays for judgment to be entered in favor of Conopco and against Defendant Phoenix as follows:

A.      On all causes of action, judgment against Phoenix in an amount to be determined at trial, but in any event not less than the United States Dollars equivalent (at the applicable exchange rate) of C$2,284,207.69 (Canadian Dollars);

B.      An award of pre-judgment and post-judgment interest on all amounts ordered, at the maximum rate permitted by law;

C.      An award of the costs and disbursements incurred by Conopco in this action, including Conopco's reasonable attorneys' fees; and

D.      Such other and further relief as may be just and proper.


Dated:  July 31, 2008
        New York, New York


                                        DAVIS & GILBERT LLP

                                        _____
                                        Neal H. Klausner
                                        nklausner@dglaw.com
                                        James R. Levine
                                        jlevine@dglaw.com
                                        1740 Broadway
                                        New York, NY  10019
                                        (212) 468-4800
                                        *Attorneys for Plaintiff Conopco, Inc.*

# EXHIBIT - A

**EXECUTION COPY**

TRANSITIONAL SERVICES AGREEMENT (this "Agreement") dated as of January 5, 2004, between CONOPCO, INC., a New York corporation ("Seller"), and PHOENIX BRANDS LLC, f/k/a WINTER HOLDINGS LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, pursuant to an Asset Purchase Agreement dated as of December 6, 2003 (the "Asset Purchase Agreement"), between Seller and Purchaser, Seller has agreed to, and has agreed to cause the Seller Affiliates to, sell, transfer, assign and deliver to Purchaser, and Purchaser has agreed to purchase, acquire and accept from Seller and the Seller Affiliates, all of Seller's and the Seller Affiliates' right, title and interest in, to and under the Transferred Assets, in each case as provided in the Asset Purchase Agreement;

WHEREAS, Purchaser has agreed to assume the Assumed Liabilities, as provided in the Asset Purchase Agreement; and

WHEREAS, Purchaser desires to purchase from Seller, and Seller is willing to provide to Purchaser, transitional services on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt of which the parties hereby acknowledge, Seller and Purchaser agree as follows:

SECTION 1. Definitions. Terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the Asset Purchase Agreement.

SECTION 2. Transitional Services. (a) During the term of this Agreement as set forth in Section 6, Seller shall provide, or use commercially reasonable best efforts to cause one or more of its affiliates to provide, to Purchaser the services set forth on Annex A hereto (the "Base Services") and the product supply services set forth on Annex B hereto, including any services set forth in Annex A-1 to the extent necessary to provide the services set forth on Annex B (the "Korex Services" and, together with the Base Services, the "Services"), in the manner, to the extent and at a level of service, including accuracy, quality, completeness, timeliness, priority and responsiveness, generally consistent with that provided by Seller or its affiliates to the Business of each Brand in the applicable jurisdictions immediately preceding the date of this Agreement, and Purchaser shall use the Services for substantially the same purposes and in substantially the same manner as the Businesses had used the Services prior to the date of this Agreement. Seller shall be required to provide the Services only to Purchaser or its permitted assigns in connection with the conduct of the Businesses. Purchaser shall not resell any of the Services to any person whatsoever or permit the use of the Services by any person other than in connection with the conduct of the Businesses in the ordinary course consistent with past practice; provided that an assignment of Purchaser's rights hereunder by operation of Section 10 shall not constitute a resale of the Services. To the extent that certain services not set forth on Annex A hereto are reasonably necessary to

the conduct of the Businesses and were provided immediately preceding the date of this Agreement by Seller or a Seller Affiliate to the Businesses in the applicable jurisdictions, the parties hereto shall agree in good faith to amend Annex A hereto to include such services, subject to the payment of mutually agreed upon fees therefor; provided that division or corporate-level services of the type currently provided by Seller to all of Seller's businesses shall not be provided hereunder by Seller to Purchaser.

(b)  Purchaser acknowledges that Seller may be providing similar services, and/or services that involve the same resources as those used to provide the Services, to its internal organizations, affiliates and to third parties.  Seller reserves the right to modify the Services in connection with changes to its internal organization in the ordinary course of business; provided, however, that no such modifications shall materially diminish the Services, including the level of service.

(c)  Purchaser further acknowledges that, in connection with providing the Services, Seller shall not be required to use its own funds for any third party provided service or payment obligation of Purchaser, its affiliates or the Businesses.  In addition, Seller shall not be obligated to pay any amounts to Purchaser, the Businesses or any of their respective employees in respect of payroll, benefits or similar obligations, unless Seller has received such amounts in advance from Purchaser.

(d)  Purchaser hereby grants to Seller a non-exclusive and non-transferable right and license to use the formulations for the Products, patents, know-how, technology, trade secrets and other proprietary information of Purchaser necessary to provide the Services solely for the purpose of providing the Services in accordance with the terms of this Agreement.

SECTION 3.  Access.  Purchaser shall make available on a timely basis to Seller all information and materials reasonably requested by Seller to enable it to provide the Services hereunder.  Purchaser shall give Seller reasonable access, during regular business hours and at such other times as are reasonably required, to Purchaser's premises or the premises of the Businesses for the purpose of providing the Services hereunder.

SECTION 4.  Payment.  (a)  For the Base Services rendered under this Agreement, Purchaser shall pay Seller, in accordance with this Section 4, the fees (the "Fees") set forth in Annex C hereto except with respect to any such service no longer provided during the applicable statement period as a result of a partial termination of services under Section 7.

(b)  No later than the eighth business day of any accounting month of Seller (it being understood that there are three such months within each 13 week fiscal quarter), Seller shall deliver to Purchaser a reconciliation statement in the form of Annex D (the "Reconciliation Statement") hereto setting forth the information required by such Reconciliation Statement for the immediately preceding accounting month of Seller. During the 10 business days following receipt of the Reconciliation Statement, Purchaser may request additional information reasonably necessary to confirm the

amounts provided in such Reconciliation Statement and Seller shall provide such requested information in accordance with Annex A. Purchaser shall provide to Seller, as soon as practicable after receipt of the Reconciliation Statement but no later than the ninth business day after receipt thereof, a notice setting forth any amounts in the Reconciliation Statement it disputes. Any amount set forth on the Reconciliation Statement as owed shall be paid within 10 business days after Purchaser's receipt of the Reconciliation Statement (the date such payments are due, a "Payment Date"). Seller and Purchaser shall use their respective commercially reasonable best efforts and act in good faith to promptly resolve any disputes or controversies relating to the Reconciliation Statement and upon such resolution to promptly reimburse each other, as applicable, any appropriate amounts (including the portion of any late fees paid pursuant to the final sentence of this paragraph (b), as pro rated such that only the portion of the late fee proportionate to the reimbursed payment shall be reimbursed). All payments required to be paid under this Section shall be paid by wire transfer in immediately available funds to one or more accounts designated in writing by Seller or Purchaser, as applicable. Any Fees not paid within five days of a Payment Date shall be subject to late charges for each day such Fees are overdue, calculated at a rate of 6% per annum from the Payment Date to the date of payment.

(c)     From and after the termination of the Base Term until the termination of the Korex Term, Purchaser shall pay to Seller each month a fee based upon the mutually agreed actual costs for the services set forth in Annex A-1 actually provided during such month, provided that such fee shall not exceed $20,000 (Canadian) per month.

SECTION 5.  Taxes.  Any taxes assessed on the provision of the Services hereunder shall be paid by Purchaser.

SECTION 6.  Term of Agreement.  (a) The term of this Agreement with respect to the Base Services shall commence on the Closing Date and shall continue for a period ending on the final day of Seller's accounting month closest to the 180th day following the Closing Date (the "Base Services Term"); provided, however, that Purchaser may terminate any Service prior to the end of the Base Services Term, pursuant to Section 7(a); provided further that Purchaser shall to the extent reasonably practicable make a good faith effort to cease using all Services under this Agreement as soon as possible following the Closing Date.

(b) Purchaser may, in its sole discretion, extend the Base Services Term for a period of 90 days (the "First Option Period") by providing written notice of such extension to Seller no less than 30 days prior to the end of the Base Services Term; provided that during the First Option Period, Purchaser shall pay a premium of 5% over the Fees charged with respect to any of the services set forth on Annex C-1 hereof that continue to be provided by Seller to Purchaser hereunder during the First Option Period.

(c) Purchaser may, in its sole discretion, further extend the Base Services Term for an additional period of 90 days (the "Second Option Period") by providing written notice of such extension to Seller no less than 30 days prior to the end of the First

Option Period; provided that during the Second Option Period, Purchaser shall pay a premium of 15% over the Fees charged with respect to any of the services set forth on Annex C-1 hereof that continue to be provided by Seller to Purchaser hereunder during the Second Option Period.

(d) The term of this Agreement with respect to the Korex Services shall commence on the Closing Date and shall continue through August 18, 2008 (the "Korex Services Term" and, together with the Base Services Term, the "Complete Term").

(e) Notwithstanding anything to the contrary contained in this Agreement, the term of the Services to be provided by Seller set forth on Annex A hereto under the heading "SALES" shall not exceed 90 days following the Closing Date.

SECTION 7.  Partial Termination; Termination.  (a) Any or all of the Base Services provided by Seller under this Agreement are terminable by Purchaser on thirty calendar days' prior written notice to Seller; provided that, in the case of a partial termination, Seller's written consent is required, which consent shall not be unreasonably withheld or delayed. Once Purchaser has terminated any of the Base Services, Purchaser shall not be permitted to request such Base Services be resumed pursuant hereto.

(b) This Agreement may be terminated prior to the expiration of its stated term, upon written notice as set forth below:

(i) by Seller, if Purchaser fails to pay any Fees within ten business days following a Payment Date;

(ii) by Seller, on the one hand, or Purchaser, on the other hand, if the other party commits a material breach of any provision of this Agreement and such breach continues for a period of thirty days following a written request to cure such breach; or

(iii) by Seller, on the one hand, or Purchaser, on the other hand, if the other party files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for it or a substantial part of its property.

(c) The Korex Services may be terminated by either Purchaser or Seller if the other party fails to perform or commits a non-trivial breach of any provision of Annex B hereto and such non-performance or breach continues for a period of 30 days following the date of written notice of the non-performance or breach; provided that if such non-performance or breach cannot be reasonably cured in such 30-day period but can be cured in a reasonable period, then same shall not constitute a ground for termination if the allegedly non-performing or breaching party promptly commences and diligently pursues such cure to completion, including by the expenditure of necessary monies, and provided further that if the alleged non-performance or breach is not cured within 90 days of the date of such written notice, the other party may, upon written

notice, terminate the rights and obligations relating to the Korex Services set forth on Annex B, if such breach is not the result of the noticing party's own breach of a provision of such agreement.

(d) The Korex Services may be terminated by either Purchaser or Seller if the other party or Korex (as defined on Annex B hereto) or the then current manufacturer files, or has filed against it and same is not dismissed or discharged within 30 days, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law or makes or seeks to make a general assignment for the benefit of its creditors or applies for or consents to the appointment of a trustee, receiver or custodian for its or a substantial part of its property.

(e) Upon the expiration or earlier termination of this Agreement or any of the Services hereunder, Purchaser shall purchase from Seller all completed products, existing ingredients, raw materials and other supplies produced or purchased by Seller and held at third-party manufacturers in the ordinary course of business in connection with the Services being terminated at such time, F.O.B. at the location of the third-party manufacturer, at Seller's actual cost therefor but only to the extent that Purchaser has not previously paid for such completed products, existing ingredients, raw materials and other supplies pursuant to Section 4. Any such ingredients, raw materials and other supplies purchased by Purchaser shall be shipped at Purchaser's cost to a location designated by Purchaser.

SECTION 8. <u>Consequential and Other Damages.</u> (a) Seller shall not be liable, whether in contract, in tort (including negligence and strict liability), or otherwise, for any special, indirect, incidental or consequential damages whatsoever, which in any way arise out of, relate to, or are a consequence of, its performance or nonperformance hereunder, or the provision of or failure to provide any of the Services hereunder, including loss of profits, business interruptions and claims of customers or employees of Purchaser.

(b) Notwithstanding anything to the contrary contained herein, the liability of Seller with respect to this Agreement or anything done in connection herewith, including the performance or breach hereof, or from the sale, delivery, provision or use of any of the Services provided under or pursuant to this Agreement, whether in contract, in tort (including negligence and strict liability) or otherwise, shall not exceed the Fees previously paid to Seller by Purchaser in respect of the Service from which such liability flows.

SECTION 9. <u>Indemnification.</u> (a) Purchaser hereby releases Seller and each of its affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives (the "<u>Seller Indemnitees</u>") and agrees to indemnify and hold harmless the Seller Indemnitees from and against any and all claims, losses, damages, liabilities, deficiencies, obligations or out-of-pocket costs or expenses, including reasonable attorney's fees and expenses and costs and expenses of investigation (collectively, "<u>Losses</u>"), arising out of or resulting from Seller's performance of the Services hereunder, except to the extent such Losses are due to Seller's gross negligence

or willful misconduct in performing the Services hereunder.

(b) If a Seller Indemnitee (the "<u>Indemnified Party</u>") receives written notice of the commencement of any action or proceeding, the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under this Section 9 (a "<u>Third Party Claim</u>") and the Indemnified Party intends to seek indemnity pursuant to this Section 9, the Indemnified Party shall promptly provide Purchaser with written notice of such Third Party Claim. Purchaser shall be entitled to participate in or, at its option, assume the defense, appeal or settlement of such Third Party Claim. If Purchaser assumes the defense, appeal or settlement of such Third Party Claim, such defense, appeal or settlement shall be conducted through counsel selected by Purchaser and the Indemnified Party shall fully cooperate with Purchaser in connection therewith and no settlement of such Third Party Claim shall be made by the Indemnified Party without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or denied).

SECTION 10.  <u>Assignment.</u>  Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by any of the parties hereto without the prior written consent of the other party hereto, except that (a) Purchaser (i) may assign its rights under this Agreement, in whole or in part, to any of its affiliates without the prior written consent of Seller and (ii) shall be obligated to assign its rights relating to the Korex Services as set forth on Annex B hereto to any permitted assignee pursuant to a permitted assignment of the Excluded Sunlight Trademarks, Patents, Designs and Technology License Agreement dated as of the date hereof, and (b) Seller may assign any rights and obligations hereunder to (i) any of its affiliates, including Unilever United States, Inc., Unilever N.V., Unilever PLC and direct and indirect subsidiaries of any of them, or (ii) third parties to the extent such third parties are routinely used to provide the Services to affiliates and businesses of Seller, in either case, without the prior written consent of Purchaser. Notwithstanding the foregoing, each of Seller and Purchaser shall remain liable for all of their respective obligations under this Agreement. Subject to the first sentence of this Section 10, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns and no other person shall have any right, obligation or benefit hereunder. Any attempted assignment or transfer in violation of this Section 10 shall be void.

SECTION 11.  <u>No Third Party Beneficiaries.</u>  Except as provided in Section 9, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

SECTION 12.  <u>Notices.</u>  All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five business days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile; <u>provided</u> that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient and (d) one business day following sending by

overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

(i) if to Seller, to:

Conopco, Inc.

390 Park Avenue
New York, NY 10022
Attention: General Counsel
Facsimile: (212) 688-3411

(ii) if to Purchaser, to:

Phoenix Brands LLC, f/k/a Winter Holdings LLC
c/o Lehman Brothers Merchant Banking
399 Park Avenue, 9th floor
New York, NY 10022
Attention: Danny James
Facsimile: (646) 758-3831

SECTION 13. Headings. The descriptive headings of the several Sections of this Agreement and the Annex to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references herein to "Sections" shall be deemed to be references to Sections hereof or the Annex hereto unless otherwise indicated.

SECTION 14. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person or by facsimile, receipt acknowledged, to the other party hereto.

SECTION 15. Integrated Contract; Annexes. This Agreement, including the Annexes hereto, any written amendments to the foregoing satisfying the requirements of Section 21, the Asset Purchase Agreement, the Confidentiality Agreement and the Ancillary Agreements, including the schedules and exhibits thereto, constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters. The Annexes are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in the Annexes but not otherwise defined therein shall be defined as set forth in this Agreement or the Asset Purchase Agreement, as the case may be. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party hereto with respect to the transactions contemplated by this Agreement, the Asset Purchase Agreement, the

Confidentiality Agreement or the Ancillary Agreements other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder. In the event of any conflict between the provisions of this Agreement (including the Annexes hereto), on the one hand, and the provisions of the Asset Purchase Agreement, the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of the Asset Purchase Agreement shall control.

SECTION 16. <u>Severability; Enforcement.</u> The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

SECTION 17. <u>Governing Law.</u> This Agreement and any disputes arising under or related thereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles (other than Section 5-1401 of the General Obligations Law of the State of New York).

SECTION 18. <u>Jurisdiction.</u> Each party irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam*, with respect to any such action, suit or proceeding.

SECTION 19. <u>Service of Process.</u> Each party agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 18.

SECTION 20. <u>Waiver of Jury Trial.</u> Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto. Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 20.

SECTION 21.  Amendments.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.

SECTION 22.  Public Announcements.  No party shall issue any press release or make any other written public statement with respect to this Agreement and matters related hereto without the prior written consent of the other party, which consent shall not be unreasonably withheld, except as required by any applicable federal, state or local requirement, in which event the party required to make the release or announcement shall allow the other party reasonable time, in light of the circumstances, to comment on such release or announcement in advance of such issuance.

SECTION 23.  Independent Contractor.  At all times during the term of this Agreement, Seller shall be an independent contractor in providing the Services hereunder with the sole right to supervise, manage, operate, control and direct the performance of the Services and the sole obligation to employ, compensate and manage its employees and business affairs.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any party with respect to the indebtedness, liabilities, obligations or actions of the other party or any of its respective officers, directors, employees, stockholders, agents or representatives, or any other person or entity.

SECTION 24.  Survival.  The provisions of Article XVIII of Annex B, Section 4, Section 5 and Sections 8 through 27 shall survive the expiration of the Complete Term or the earlier termination of this Agreement for any reason whatsoever.

SECTION 25.  Priority of Agreements.  (a)  To the extent that there is a conflict relating to payment terms between this Agreement and Annex B hereto the terms and provisions of Annex B shall govern.

(b)  Nothing in this Agreement shall be deemed to modify, limit or amend the Assumed Liabilities set forth in the Asset Purchase Agreement.

SECTION 26.  Force Majeure.  Seller shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any cause beyond its reasonable control, including strikes, labor disputes, civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, acts of terrorism, embargo, natural disaster, acts of God, flood, fire, power failures, sabotage, accident, delay in transportation, loss and destruction of property, intervention by governmental entities, change in laws, regulations or orders, other events or any other circumstances or causes beyond Seller's reasonable control.  In such an event, Seller and Purchaser shall in good faith make the best possible arrangements by mutual agreement and according to the circumstances.

SECTION 27.  <u>Warranties.</u>  Seller has not made any express or implied warranty with respect to the Services.

SECTION 28.  <u>Confidential Information.</u>  (a)  The parties acknowledge that in the course of performing their respective obligations hereunder, each party will come into possession of confidential information of the other (collectively, "<u>Confidential Information</u>").

(b)  Confidential Information of the disclosing party coming into possession of the receiving party shall remain the sole and exclusive property of the disclosing party.  The receiving party shall use reasonable care, but in no event less care than such party uses to safeguard and protect its own Confidential Information, to protect the Confidential Information of the other party and such party shall not use such Confidential Information for any purpose other than the discharge of its obligations under this Agreement.  Each party may make available the Confidential Information of the other party to those of its and its affiliates' officers, directors, employees, agents and representatives (each a "<u>Representative</u>") only on a "need to know" basis. Representatives shall be advised of their obligation to abide by the confidentiality obligations set forth herein and the receiving party shall be responsible for a breach by any of its Representatives. Neither party shall divulge the Confidential Information of the other to any third party without the prior written consent of the disclosing party, except as the receiving party is specifically required by any Governmental Entity lawfully requesting the same, under compulsion of civil or criminal process or to any court of competent jurisdiction acting pursuant to its powers and then only after notice has been given to the disclosing party as early as reasonably possible so that the disclosing party can attempt to object to such disclosure.

(c)  Information disclosed hereunder shall not be considered "Confidential Information" to the extent it is (i) previously known by the receiving party prior to the disclosure thereof, (ii) hereafter becomes, other than through the fault of the receiving party, generally available to the public, (iii) disclosed to the receiving party by a third party other than in breach of an obligation of confidentiality owed by such third party to the disclosing party or (iv) independently developed by the receiving party without using Confidential Information as shown by the receiving party's written records.

(d)  Upon the expiration of the Complete Term or earlier termination of this Agreement, unless otherwise required by applicable laws, rules or regulations, each party shall return to the other all Confidential Information of the other within its possession or control, and not thereafter use such Confidential Information in the promotion of its own business or the business of any third party, or otherwise make use of or refer to any Confidential Information or the identity of the other party.  The obligations of confidentiality set forth herein shall remain in effect for five years after the expiration or earlier termination of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first set forth above.

CONOPCO, INC.,

by

Name: Mart Leius

Title: Vice President

12

PHOENIX BRANDS LLC, f/k/a WINTER
HOLDINGS LLC,

by

Name:  Eugene Mark Landy
Title:   Manager

2316278

ANNEX A

## DESCRIPTION OF TRANSITIONAL SERVICES

| SERVICE AREA | DESCRIPTION OF SERVICE | REPORTING REQUIREMENT |
|---|---|---|
| **PRODUCTION** | | |
| Production Planning/Scheduling | Develop consensus demand for products. Develop a master production schedule and develop and agree, subject to Purchaser review, to a monthly production schedule with the plants and co-packers. | Consensus demand report (frequency: monthly). Production plan (frequency: bi-weekly). All normal plant reports for scheduling. |
| Purchase/Procure Components | Negotiate supply arrangements needed to fulfill this Agreement and generate purchase orders for production items. Purchaser shall have the right to review and approve contracts involving obligations beyond the term of this Agreement and in excess of $50,000. Obtain component materials, ensuring procurement of sufficient quantity and quality thereof, including under the Supply Agreement, dated January 1, 2002 between Huish Detergents, Inc. and Unilever Home & Personal Care USA included in the Transferred Contracts. | Contract/purchase order status (frequency: monthly). Copies of all applicable purchase orders, exclusive to the Business. |
| Inventory Component Materials | Maintain and manage inventory of component items. Ensure appropriate controls over and maintenance of inventory. Maintain inventory records. Record inventory transactions on a timely basis. Have record-keeping in place to support vendor recall. | Plant component inventory (frequency: monthly). |
| Quality Assurance | Oversee compliance with material product specifications. | |
| Forecasting Requirements | Develop with Purchaser and plants forecasts for production requirements. | |
| Product Supply | With respect to the Final Touch Products, to manufacture or to have manufactured Final Touch Products in the ordinary course of business, subject to ordinary and customary capacity | |

## DESCRIPTION OF TRANSITIONAL SERVICES

| | | |
|---|---|---|
| | restraints and pursuant to the price schedule listed on Annex F. hereto. | |
| **TRANSPORT/WAREHOUSE** | | |
| Warehouse/Inventory Product | Arrange for and execute carrier delivery of finished goods from plants to Unilever distribution centers or Purchaser designated distribution centers. Seller shall store Products, inventory and any other materials that are used or held for use in, relate to or are otherwise necessary for the manufacture, packaging or distribution of the Products at Seller's owned or third-party distribution centers. Periodically reconcile distribution center records with internal records. Record inventory adjustments on a regular and timely basis. Within 30 business days after the end of the Base Services Term, Seller shall arrange for the shipment of Products in full truckload quantities (on common carriers selected by Purchaser) at Purchaser's expense to locations specified by Purchaser in writing at least 15 business days prior to Seller's first shipment. | Inventory by SKU, by location, by status code (frequency: weekly). Inventory write-off report (frequency: monthly). |
| **SALES** | | |
| Manage field sales force and broker network, take customer orders | | |
| **CUSTOMER SERVICE – ORDERS** | | |
| Maintain Product/Customer Data | Maintain and provide Purchaser with the sales system master data regarding the Businesses' products (including configurations, price and trade deals). Maintain and provide Purchaser with the sales system master customer files including order, shipping and billing data for the product by customer account. | Customer master data for customer purchasing Businesses' brands (frequency: one time) |
| Communicate Info to Customers | Communicate news on the Businesses' products, prices and deals, with customers. | Copy provided of all customer communications (frequency: as needed). |
| Pricing Management | Within 15 business days of written request by Purchaser, Seller | Product price list (frequency: |

## DESCRIPTION OF TRANSITIONAL SERVICES

| | | |
|---|---|---|
| | will provide customers notice of upcoming price changes with respect to the Businesses' list price customers, per Purchasers instruction consistent with past practices. | monthly). |
| Process Customer Orders | Accept and provide orders from customers, check and provide correct order errors to ensure final orders are correctly entered into the system on a timely basis, change orders as requested by customers and answer customer questions regarding order status. Orders received by Seller after the Base Services Term shall be immediately transferred to Purchaser. | Orders by customer/SKU (frequency: daily). |
| **PICK/SHIP ORDERS** | | |
| Pick Product for Orders | Generate picking documents for orders/deliveries. Physically pick and stage product for pick-up by carrier or customer. | |
| Ship Product to Customer | Per customer purchase orders, arrange for carrier to pick up product at the warehouse and deliver to customer on a timely basis; provided that Seller shall prepare bills of lading relating to such carrier's delivery. | Customer short shipments (frequency: weekly). |
| **CUSTOMER SERVICE - CREDIT/COLLECTION** | | |
| Invoice Customer | Generate and deliver invoices to brokers/customers in a timely manner, consistent with past practice. Post accounts receivable and the status relating thereto. Handle customer billing inquiries. | Sales for the day (frequency: daily). Sales by customer/product month-to-date and year-to-date (frequency: weekly). |
| Receive/Apply Cash | Collect and process all receivables from customers, including, subject to commercially reasonable efforts to collect, amounts deducted by any customer invoices. Apply payments against the Businesses' customer receivables. Establish a methodology for identifying a payment or deduction as related to a pre-Closing (Seller) or post-Closing (Purchaser) sale. Establish a basis for identifying the Businesses part of a customer's receivable account. Seller shall notify Purchaser of any major collections issues in relation to Purchaser's receivables. | Accounts Receivable status report (including deductions) - format and content to be determined based on methodology employed to determine A/R (frequency: monthly). |
| Credit | Use current credit terms and limits, monitor available credit and | |

4

| | DESCRIPTION OF TRANSITIONAL SERVICES | |
|---|---|---|
| | take appropriate preventative and corrective actions relating thereto. Seller shall notify Purchaser of any change in payment terms relating to the customers of the Businesses. | |
| Management of Direct Marketing and Trade Deals | Seller shall provide, or shall arrange for a Seller Affiliate to provide, payment and financial services for direct marketing and trade deals to customers. | Detail of direct marketing and trade deal expenses (frequency: monthly) |
| **FINANCE** | | |
| Perform General Accounting | Process journal entries, allocations and period end adjustments, analyze and reconcile general ledger accounts, prepare and post management adjustments. | Sales for the day (frequency: daily). Sales by customer/product month-to-date and year-to-date (frequency: monthly). |
| Perform Cost Accounting | Maintain standard product costs. Ensure COGS is properly posted to the general ledger. Perform variance analysis and post variances to the GL. | Plant variance analysis (frequency: monthly). Variance analysis by profit center (frequency: monthly). |
| Report Results | Prepare and provide for Purchaser financial statements in accordance with Unilever Management reporting principles in electronic and paper form for the Products and Businesses' brands as agreed by Purchaser and Seller including (i) the Statement of Direct Revenues and Expenses (ii) a statement of selected assets; provided that such information is provided on the 8th business day of each fiscal month. | Statement of Direct Revenues+Expenses, (frequency: monthly). Statement of Selected Assets (frequency: monthly). |
| **INFORMATION SYSTEMS** | | |
| Maintain IS Systems | Maintain existing SAP software and hardware that supports the Businesses' business and locations. | |
| Indianapolis Desktop Application Access | Provide access to software applications running on individual desktops at the Indianapolis Facility that are subject to a Unilever company-wide license; provided that, with respect to any application, Seller shall not be required to continue to provide such access to the extent that providing such access would require Seller to pay any additional fee or other cost not | |

5

| | | DESCRIPTION OF TRANSITIONAL SERVICES | |
|---|---|---|---|
| | | paid in advance by Purchaser to the applicable vendor of such application. | |
| | Maintain Corporate Level IS systems. | Provide and maintain corporate level IS systems and access to related software applications. | |
| **MISCELLANEOUS** | | | |
| | Manage Breakage and Spoilage | Develop a methodology for identifying a product breakage claim as applicable to the pre-Closing (Seller) or post-Closing (Purchaser) period. Respond to all Customer damaged product claims for products sold after the Closing Date in accordance with standard company procedures. | Breakage and spoilage analysis TBD (frequency: monthly). |
| | Manage Carrier Claims | Process product damage/loss claims with the carriers. Ensure credit for the Businesses' claims are reflected on the Businesses' financial statements. | |
| | Process Consumer Inquiries | Administer consumer inquiries, complaints and request in a manner consistent with past practice, both through the call center and by way of correspondence handled by consumer affairs. | Businesses' brand consumer responses (frequency: weekly). |
| | Books and Records | Keeping of books and records of the Services provided under this Agreement in the same detail and with the same accuracy that Seller and its affiliates keep their respective books and records with respect to the Businesses immediately preceding the date of this Agreement. Making available on a timely basis to Purchaser all information and materials reasonably requested by Purchaser to enable it to utilize or transition off of the Services provided under this Agreement or reasonably necessary to perform the reviews specifically described in this Agreement and otherwise reasonably necessary to determine Seller's compliance with its obligations under this Agreement, except where prohibited by a confidentiality agreement or other confidentiality restrictions and except where such information relates to Seller's businesses other than the Businesses or is otherwise commercially sensitive to Seller. | On a timely basis. |

2316278
[[NYCORP:2316278v14:1224:03]]

6

## DESCRIPTION OF TRANSITIONAL ASSISTANCE

Seller shall provide reasonable orientation to Purchaser to the extent reasonably necessary to assist Purchaser in assuming responsibility for the Base Services.

| SERVICE AREA | DESCRIPTION OF SERVICE | REPORTING REQUIREMENT |
|---|---|---|
| Customer Letter | Promptly after Closing, Seller shall work with Purchaser to draft and distribute a joint letter to all of Seller's and the Seller Affiliates' customers of the Products concerning the sale of the Businesses to Purchaser. | |
| Joint Customer Sales Calls | Prior to the termination of the Base Services Term, Seller agrees to conduct a joint customer sales call with each customer in the United States, Canada and Puerto Rico with whom Seller has historically conducted such sales calls. Seller shall conduct one customer review meeting per customer prior to the joint sales calls to the customers. | |
| Information Meetings | Seller shall mutually agree with Purchaser on a schedule of informational meetings between appropriate Customer Business Development personnel of Seller and appropriate personnel of Purchaser. | |
| Transferred Data | Seller or Seller Affiliates shall use its best efforts to ensure that all data sent to or shared with Purchaser is in a format compatible with Purchaser's computer system. * | |

* Does not include IT cost for cutover and conversion to Purchaser systems—to be charged on time and material basis at a rate of $75/hour.

ANNEX A-1

Production Planning/Scheduling
Quality Assurance
Perform General Accounting

I.    Definitions

"Agreement" means the Transitional Services Agreement between Seller and Purchaser of which this Annex B constitutes a part.

"Binding Forecast" means a forecast by Purchaser of the quantities of Korex Products to be purchased by Purchaser during a four-week period from the date of the forecast.

"CPI" means the Consumer Price Index measured for the twelve months of the preceding operating year ending immediately prior to the month of measurement.

"Estimated Forecast" means a written estimated forecast by Purchaser of quantities of Korex Products to be purchased by Purchaser covering a period of 13 weeks from the date of expiry of the Binding Forecast. An Estimated Forecast represents a non-binding commitment of Purchaser to purchase the Korex Products identified thereon.

"Good Manufacturing Practices" means the practices for the manufacture, preparation, storage and transportation of the Korex Products that would comply with all applicable federal, provincial and municipal laws, rules and regulations.

"Korex" means Korex Don Valley ULC and any successor or assign thereof, including any third party manufacturer utilized by Seller for the procurement of Korex Products, to the extent permitted under the Korex Agreement.

"Korex Agreement" means the Manufacturing Agreement between Korex and U.L. Canada Inc. made as of August 18, 2002.

"Korex Products" means those products set forth under the heading "Item Description" on Schedule 1 hereto.

"Korex Term" means the period from and including the Closing Date to and including August 18, 2008.

"Materials" means the raw and packaging materials required to produce the Korex Products.

"Molds" means the molds required to produce the Korex Products owned by Purchaser.

"Specifications" means the specifications, formulae, manufacturing process, practices, materials, standards and specific quality requirements and characteristics covering all finished Korex Products, product testing, and the raw and packaging materials used for manufacture of the Korex Products as utilized by Korex as of the Closing Date with respect to the manufacture of the Korex Products, as may be changed from time to time in accordance with this Annex B.

"Specified Period" means the annual period commencing on August 18; provided that for the period from the Effective Date to and including August 18, 2004, (A) the determination of whether any Shortfall Tonnes or Excess Tonnes, in each case as defined herein, exist shall be based upon pro rating the Specified Volume for such period and (B) the determination of whether Purchaser's Exclusivity Requirement, as defined herein, has been met, shall be based upon pro rating Purchaser's Exclusivity Requirement for such period.

Terms that are not otherwise defined in this Annex B shall have the meanings ascribed to them in the Agreement or the Asset Purchase Agreement, as the case may be.

II.    Currency

Unless otherwise noted, all amounts due and payable under this Annex B shall be payable in, and all amounts listed in this Annex B are quoted in, Canadian Dollars.

III.    Supply of Korex Products

Seller agrees to cause Korex to manufacture the Korex Products and Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Korex Products, subject to the terms and conditions of this Annex B; provided that Purchaser's obligation to purchase from Seller the Korex Products hereunder shall terminate, subject to the termination rights set forth in Section 7 of this Agreement, immediately upon the termination of the Korex Agreement.

IV.    Binding and Estimated Forecasts

(A)    Not later than the fifth day of each four-week period during the Korex Term, commencing with the four-week period immediately following the Closing Date (the "Effective Date"), Purchaser shall provide Seller with a written forecast of Purchaser's projected demand for the Korex Products for the thirteen-week period commencing on the first day of such four-week period following the four-week period in which the forecast is delivered and for the two four-week periods following such four-week period (it being understood that during the period from and after the Effective Date through the end of the first four-week period following the four-week period in which the Effective Date occurs, Seller's anticipated purchase of Korex Products relating specifically to the Businesses, as in effect on the Effective Date, shall constitute the Binding Forecast for such period). Each forecast delivered by Purchaser shall also specify the quantities of Korex Products required on a weekly basis during the forecast period. The Binding Forecast shall set forth the total quantity of Korex Products that Purchaser shall order for delivery in such period and shall constitute a commitment by Purchaser to purchase and pay for the quantity of Korex Products specified therein. Purchaser and Seller shall also acknowledge an Estimated Forecast with respect to the Korex Products. The Binding Forecasts and Estimated Forecasts will be updated

by Purchaser on a weekly, rolling basis. The Estimated Forecast shall, subject to paragraph (B) below, constitute a nonbinding, good faith estimate of the quantity of Korex Products that Purchaser expects to order for delivery during such period. Purchaser may not make a material revision to the forecast of the Korex Products to be manufactured during any period covered by a Binding Forecast without Seller's consent. Any provision herein to the contrary notwithstanding, in the case of a planned shutdown of the Korex facility or the then current manufacturing facility that will not exceed any two week period in a given operating year and for which Seller provides notice to Purchaser at least 90 days prior to the shutdown, Purchaser and Seller shall work together to increase deliveries in prior weeks or otherwise to reasonably accommodate Seller's inability to make deliveries during such shutdown.

(B)    In the event that Purchaser does not deliver a Binding Forecast for the next four-week period by the fifth day of the then current four-week period, the Estimated Forecast for the following four-week period shall become the Binding Forecast for such following four-week period.

(C)    Notwithstanding anything herein to the contrary, any quantities set forth in a Binding Forecast may not exceed, for all Korex Products, a total of 2,262 tonnes and any purchase order shall be subject to and limited by Korex's available capacity and run rules for the manufacture of the Korex Products, in each case consistent with Korex's past practices.

(D)    The Korex Products may, without penalty to Seller, be packaged and delivered in a quantity ranging from 5% above to 5% below that specified in the applicable Binding Forecast.

V.    Quantity

Notwithstanding any other provision hereof or of any Binding Forecast, Estimated Forecast or purchase order, Seller shall use reasonable commercial efforts to cause Korex to accommodate Purchaser's written requests for (A) priority supply of particular Korex Products to meet unanticipated requirements or (B) supply of a quantity of Korex Products which exceeds a purchase order or a Binding Forecast for such Products, provided that Purchaser agrees in advance to pay and pays any significant incremental costs reasonably and properly incurred by Seller to fill such request.

VI.    Priority of Agreements

In the event of a direct conflict between this Annex B and any purchase order or the Binding Forecast, the documents shall govern in the following priority: (A) this Annex B, (B) the Binding Forecast and (C) a purchase order.

VII.  Warehousing

During the Base Services Term, Seller shall provide warehousing for the Korex Products in accordance with Annexes A and C of the Agreement.  Following the Base Services Term, Seller shall not be responsible for any warehousing services and Seller shall reimburse Purchaser for any incremental cost related thereto.

VIII.  Failure to Ship

In the event Seller fails for any reason to manufacture or deliver Korex Products in compliance with a Binding Forecast, subject to the terms and conditions herein, Purchaser may, in addition to other remedies available pursuant to this Annex B and under applicable law, procure sufficient quantities of Korex Products from other sources or manufacture sufficient Korex Products to make up such deficiency, and Seller shall pay to Purchaser on demand the amount by which the cost of such procurement or manufacture reasonably and properly incurred by Purchaser exceeds the price for such Korex Products hereunder.

IX.  Freight and Shipment

Seller shall arrange, at the direction and sole expense of Purchaser, for shipment of Korex Products to destinations as designated by Purchaser and shall coordinate with Purchaser's approved carriers in order to arrange for pickup of the Korex Products at the then current manufacturing facility.  To the extent that Seller incurs increased costs from Korex as a result of shipping directions provided by Purchaser, such incremental increase in costs shall be payable by Purchaser to Seller, provided that Seller shall provide to Purchaser reasonable documentation of such increased costs prior to payment of such increase by Purchaser.  The Korex Products shall be delivered F.O.B. the manufacturing facility.

X.  Molds

(A)  Purchaser must maintain the Molds purchased from Seller relating to the Korex Products at the manufacturing facility where Korex Products are manufactured until such Molds are no longer used in the manufacture of the Korex Products or until the expiration of the Korex Term.

(B)  Seller will cause Korex to not use any of the Molds other than as specified in this Annex B unless agreed to by Purchaser in advance in its sole discretion, acting reasonably, following consultation between the parties (which consent shall not be unreasonably withheld or denied).

(C)  To the extent that Purchaser removes molds from the then current manufacturing facility pursuant to this Annex B, Purchaser shall be responsible for all costs of removal.

(D)  Purchaser shall be responsible for the repair and maintenance of the Molds and for any capital expenditures required in order to replace or upgrade

such Molds or other equipment used in the manufacture of the Korex Products.

(E)     To the extent that Korex has provided any third party or government entity with an acknowledgement of a security or ownership interest for the benefit of Seller in respect of the Molds, Seller shall take all reasonable steps to transfer such security or ownership interest to Purchaser in respect of the Molds or provide to Purchaser all benefits of any such acknowledgment.

XI.     <u>Inventions and Discoveries</u>

Seller shall cause Korex to fully disclose to Purchaser all inventions and discoveries made by Korex or ideas conceived by Korex, its directors, officers, employees or agents, whether patentable or not, useful exclusively for the manufacture or commercial exploitation of the Korex Products, either solely or jointly with others, as a direct result of or in connection with the services of Korex furnished under this Annex B. All such inventions, discoveries and ideas shall be considered work for hire and all rights, title and interest thereto anywhere in the world shall be the property of Purchaser. In the event that such inventions, discoveries and ideas shall not be considered, for any reason, work for hire, Seller shall cause Korex to unconditionally assign to Purchaser all of its right, title and interest therein. Seller shall cause Korex to execute any and all documents deemed necessary by Purchaser to effect the foregoing agreements at any time, whether before or after the expiration or earlier termination of this Annex B. Compensation for any such inventions, discoveries or ideas shall be deemed to be included in the amounts paid to Seller hereunder.

XII.    <u>Prices</u>

(A)     Prices for the Korex Products are set forth on Schedule 1 hereto and are comprised of a toll fee and a Materials cost. The toll fee may be adjusted as described in paragraph (C) of this Article XII and as described in Article XV hereof. The Materials costs may be adjusted from time to time to reflect the cost of the Materials included in the Korex Products.

(B)     Seller may propose to Purchaser in writing price adjustments for the Materials where prices have changed or shall change. Purchaser shall be deemed to approve a proposed price adjustment if Purchaser does not direct Seller, on or before the date that the price for Materials is adjusted as set forth in the proposed adjustment, to an alternate source to provide such Materials, in which case the price adjustment shall be based on the Materials pricing from such alternate source (it being understood that Seller shall use reasonable efforts to cause Materials to be purchased from such alternate source).

(C)     Toll fee adjustments shall be done as follows:

(1)    From and including the Closing Date to and including August 18, 2004, there shall be no inflation adjustment in the toll fee.

(2)    From and including August 19, 2004 to and including August 18, 2006, toll fees shall be adjusted by applying to the toll fee for the previous year a factor equal to the Canadian CPI (all items) minus 2%, provided that such factor is positive.

(3)    From and including August 19, 2006 to and including August 18, 2008, toll fees shall be adjusted, subject to Article XVI hereof, by applying to the toll fee for the previous year a factor equal to the Canadian CPI (all items) minus 2%, provided that such factor is positive.

(D)    Any rebate received by Seller or a Seller Affiliate arising directly from the procurement of Materials included in the Korex Products sold to Purchaser during the Korex Term and not otherwise set forth in the prices listed on Schedule 1 hereto shall be payable to Purchaser.

(E)    To the extent Seller receives a rebate from Korex, Purchaser will receive a pro rata share of such rebate, as determined by the Korex Products' percentage of the total tonnage of Seller's products manufactured at such facility.

XIII.    Exclusivity

(A)    In the event Purchaser's purchase of  Korex Products from Seller during a Specified Period is less than or equal to 21,600 tonnes (such 21,600 tonne minimum is "Purchaser's Exclusivity Requirement"), Purchaser shall not remove the manufacturing of any Korex Products from Korex's manufacturing facility solely for the purpose of manufacturing such requirements in another of Purchaser's or any of its affiliates' facilities or another co-packer facility, unless Purchaser pays to Seller on a monthly installment basis during such period in which Purchaser's purchase of Korex Products falls below Purchaser's Exclusivity Requirement the following amount per annum:  the product of (1) ($271) multiplied by (2) (the difference between (a) 21,600 minus (b) the annual total of all such removed Korex Products then produced by Korex during that Specified Period); provided that Purchaser shall not be required to pay such amounts under this Article XIII to Seller for any period in which Korex is not entitled under the Korex Agreement to a payment from Seller arising directly as a result of Seller's procurement of products (including the Korex Products) from a manufacturer other than Korex, except as permitted in the Korex Agreement.

(B)    If Purchaser's Exclusivity Requirement is exceeded and if Purchaser, during the applicable Specified Period, desires to procure Korex Products in excess of Purchaser's Exclusivity Requirement from a party other than

Seller, then Purchaser shall provide written notice of such request to Seller and Seller and Purchaser shall meet to discuss such request in good faith; provided that Purchaser shall not procure Korex Products from a party other than Seller if such procurement would reasonably be expected to result in a requirement that Seller pay a fee or price adjustment to Korex under the terms of the Korex Agreement.

(C)    If Seller has met its exclusivity requirements under the Korex Agreement allocable to non-Korex Products in the liquids category during a Specified Period and if Seller moves the production or procurement of non-Korex Products in the liquids category in excess of such exclusivity requirement to a party other than Korex, Purchaser shall not be required to pay to Seller any penalty or fee payable by Purchaser under paragraph (A) of this Article XIII to the extent such penalty or fee is directly attributable to the non-Korex Products removed by Seller.

XIV.    <u>Minimum Volume</u>

For each period of one year from and after the Closing Date to and including the fourth anniversary of the Closing Date and, calculated on a pro rated basis, for the period from and after the fourth anniversary of the Closing Date through the remainder of the Korex Term, Purchaser acknowledges and agrees that Purchaser shall purchase from Seller a volume of Korex Products no less than 70% of 21,600 tonnes of Korex Product.

XV.    <u>Adjustments by Volume</u>

From and including the Closing Date to and including August 18, 2006 (and, subject to Article XVI hereof, from and including August 19, 2006 to and including August 18, 2008) when actual volumes for a Specified Period fall outside the range of 70% to 130% of 21,600 tonnes (the "<u>Specified Volume</u>"), aggregate toll fees (i.e., exclusive of Materials costs) for the Korex Products for such Specified Period shall be adjusted retroactively for such Specified Period to equal: (A) if volume is less than 70%, the difference between (1) [the product of (a) (70% of the Specified Volume during the applicable Specified Period for the Korex Products in tonnes) multiplied by (b) (Initial Price Per Tonne)] minus (2) [the product of (a) (Shortfall Tonnes) multiplied by (b) (Variable Cost Per Tonne)]; and (B) if volume is greater than 130%, then the sum of (1) [the product of (130% of the Specified Volume during the applicable Specified Period for the Korex Products in tonnes) multiplied by (b) (Initial Price Per Tonne)] plus (2) [the product of (a) (Excess Tonnes) multiplied by (b) (Variable Cost Per Tonne)]; where the "<u>Initial Price Per Tonne</u>" shall be $463 as adjusted under Article XII(C) hereof through the beginning of the year for which the calculation is to be made; "<u>Shortfall Tonnes</u>" shall be the difference between 70% of the Specified Volume of the Korex Products in tonnes and the actual volume in tonnes of the Korex Products for the Specified Period for which the calculation is to be made; "<u>Variable Cost Per Tonne</u>" shall be $192; and "<u>Excess Tonnes</u>" shall be the difference between the actual volume in tonnes of the Korex Products for the year for which the calculation is to be made and 130% of the Specified Volume of the Korex Products in tonnes. Invoices for amounts to be paid or

credits to be made that are required to adjust toll fees retroactively resulting from the calculations set forth above shall be issued by Seller within 150 days of the end of the operating year for which the calculations have been made. In addition to such invoices, Seller shall attach to any such invoice, a copy of the calculations and back-up documents reasonably sufficient to support the calculations. Any disagreement between Seller and Purchaser with respect to such calculations or the amounts to be paid or credited shall be settled by an independent arbitrator. Notwithstanding anything to the contrary contained in this Article XV, (A) there shall be no adjustment hereunder despite the existence of Shortfall Tonnes in the Specified Period if Korex is not entitled to the payment of a fee adjustment from Seller under the Korex Agreement with respect to purchase volume in the liquids category for such Specified Period and (B) there shall be no adjustment hereunder despite the existence of Excess Tonnes in the Specified Period if Seller is not entitled to the payment of a fee adjustment from Korex under the Korex Agreement with respect to purchase volume in the liquids category for such Specified Period.

XVI.    Competitiveness

Toll fees charged hereunder shall be considered to be competitive when the total toll fee for Purchaser of all Korex Products falls within (i.e. less than or equal to) the total (at the same volume) toll fee plus no more than 2% of the total toll fee (adjusted to include the same terms as applicable hereunder, including warehousing, the standard allowance for losses, and bottle blowing packaging) of the same Korex Products delivered to Toronto at the same volumes for the balance of the term for the period from and including August 18, 2006 to and including August 18, 2008, quoted in a written binding quote (a "Competitive Quote") by viable competitors (Purchaser's plants excluded). From and including August 18, 2006, Seller must be competitive as per the definition above in accordance with the process set forth herein and Seller shall notify Purchaser within 90 days following receipt of written notification from Purchaser regarding a competitive bid (as described below) whether it will be competitive by the end of the six-month period commencing on the date such notice was received. Seller agrees that beginning on February 18, 2006, Purchaser may submit a written competitive offer for Korex Products to be purchased on or after August 18, 2006 to Seller and that Seller shall place Purchaser's written competitive offer with an independent third party evaluator (which shall not then have or have had for the prior three years any business relationship with Purchaser, Seller or Korex) selected jointly by Korex and by Seller, upon consultation with Purchaser, and Korex may submit during such 90-day period its proposals to such evaluator, and such evaluator shall determine whether the proposal by Korex is competitive with the Competitive Quote as defined above. If within the 90-day period Seller has advised Purchaser that Korex cannot become competitive by the end of the 6-month period following receipt by Seller of written notification from Purchaser, or Korex does not submit within such 90-day period a proposal that is competitive as defined above, then Purchaser shall have the right to accept the terms (or terms more favorable to Purchaser) in the Competitive Quote for the Korex Products.

XVII.   Manufacturing Standards

(A)     The Korex Products shall be manufactured in accordance with the product

Specifications. Seller shall cause the Korex Products to be manufactured with Good Manufacturing Practices. Such specifications may be changed with the mutual consent of both Purchaser and Seller and, in the case of Seller, upon receiving consent from Korex; provided that, to the extent a change in the Specifications requested by Purchaser or as required by applicable law results in an incremental increase in costs, Purchaser shall pay such incremental increase.

(B)    Recognizing that business will change during the Korex Term, Purchaser may require from time to time the implementation of product changes which may render some Materials obsolete. If Korex is unable to use those Materials in inventory in other products or businesses without incurring any incremental costs over its ordinary operations or other commercial harm, Purchaser will buy any reasonable inventory on hand (on the basis of a Binding or Estimated Forecast). Seller will invoice the Materials at the actual prices paid by Seller, plus freight to Purchaser's designated location. Materials in excess of such reasonable inventory amounts will be Seller's responsibility, unless Purchaser shall have consented to such excess purchases of Materials.

XVIII. Invoice and Payment Terms

(A)    Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall be invoiced separately for the purchase and manufacture of the Korex Products. Purchaser shall pay such invoices related to the Korex Products within 10 days after Purchaser's receipt of the invoice from Seller.

(B)    To the extent Seller owes any payments to Purchaser hereunder, including proceeds arising from rebates or fee adjustments, Seller shall promptly provide notice of such to Purchaser and pay such proceeds to Purchaser within 10 days of such notice.

(C)    To the extent Purchaser owes any payments to Seller hereunder, including fees arising from fee adjustments, Seller shall provide notice of such to Purchaser and Purchaser shall pay such fees within 10 days of receiving such notice.

XIX.    Nonconforming Products

(A)    Any Korex Products supplied hereunder that do not conform to the Specifications and all other requirements applicable to the Korex Products shall be deemed "Non-conforming Products". Purchaser shall notify Seller within thirty (30) days of any Non-conforming Products delivered to Purchaser after Seller's delivery of such Non-conforming Products. Any such Non-conforming Products shall be returned to Seller at Seller's cost, and Seller, as soon as practicable, shall replace such Non-conforming

Products with Products that meet the Specifications and all other requirements applicable to the Korex Products. Without limiting the foregoing, Seller shall have the right to examine and test any Korex Products that Purchaser claims are Non-conforming Products.

(B)     Subject to the provisions of this Annex B, Purchaser shall have the right to reject any Non-conforming Products, and Seller, at its sole cost and expense, shall cause such products to be reworked and redelivered to Purchaser or destroyed, which destruction shall be in compliance with all applicable environmental laws, at Seller's sole cost and expense, at Seller's election, such Non-conforming Products. Any Non-conforming Products that Seller reworks and remain Non-conforming Products after delivery to Purchaser shall, at Purchaser's election, in its sole discretion, be disposed of in compliance with all applicable environmental laws at Seller's sole cost and expense.

## XX.     Effect of Expiration or Termination

Upon the end of the Korex Term or earlier termination of this Agreement, all Materials and Korex Products shall be loaded F.O.B. the manufacturing facility where Korex Products are manufactured for shipment at Purchaser's cost to a location designated by Purchaser. Purchaser shall purchase from Seller all such quantities of Materials and unfinished inventory at Seller's actual cost therefor. Purchaser shall purchase all Korex Products at the then current price for the Korex Products.

## XXI.     Assignment of Manufacturing Agreement

Purchaser acknowledges and agrees that at any time during the Korex Term, Seller may, subject to gaining all necessary third party consents, assign to Purchaser its rights and obligations, in each case only to the extent they relate to the Korex Products, under the Korex Agreement. Purchaser further acknowledges and agrees that upon such assignment Purchaser shall assume all of Seller's rights and obligations, in each case only to the extent they relate to the Korex Products, under such agreement. Notwithstanding anything to the contrary contained in this Article XXI, Purchaser shall not be required to accept assignment of any of Seller's rights and obligations that materially differ from those contained in this Annex B, and Seller shall not be relieved of any such differing rights and obligations not subject to such assignment.

## XXII.     Rights under the Korex Agreement

To the maximum extent possible so as not to conflict with the terms of the Korex Agreement, Seller shall convey to Purchaser all of Seller's rights and benefits under the Korex Agreement (A) arising out of representations and warranties and covenants made by Korex relating to the quality of the Korex Products and (B) arising out of indemnification obligations of Korex, in each case to the extent such indemnification is available and relates to the supply of Korex Products hereunder. Seller represents and warrants that in all material respects the terms and conditions of this Annex B, including

the pricing on Schedule 1 hereto, are no less favorable to Purchaser than the corresponding terms and conditions under the Korex Agreement are to Seller. Seller further represents and warrants that the contract terms of the Korex Agreement, upon which the terms and conditions set forth in this Annex B have been derived, have remained unchanged in all material respects from and after January 1, 2003 to and including the date of the Asset Purchase Agreement.

## XXIII. Terms and Conditions

Each transaction pursuant to this Annex B shall be subject to the terms and conditions set forth herein; any terms and conditions in any purchase order, invoice, instrument or other document provided by one party to the other during the course of performance that conflict with, vary or add to the terms and conditions set forth herein shall be void and of no force and effect.

**SCHEDULE 1**

<u>Prices</u>

Amounts in Canadian Dollars

| Material # | Item Description | Material Cost (1) | Toll fee (2) | Total Cost |
|---|---|---|---|---|
| 20604 | Sun AB HDISH 12X1.2L | 10.76 | 7.50 | 18.27 |
| 20614 | Sun HDISH LIQ 2X6L Case Lemon CA | 9.27 | 6.27 | 15.53 |
| 20618 | Sun HDISH 2X6.0L Pallet | 480.89 | 325.84 | 806.73 |
| 20623 | Sun HDISH LIQ 24X500ML | 8.87 | 6.29 | 15.16 |
| 20624 | Sunlight HD 12X750ML Apple | 6.66 | 4.70 | 11.36 |
| 20625 | Sunlight HD 12X1.2L Apple Sensation | 10.13 | 7.51 | 17.64 |
| 20626 | Sun HD 12X750ML Sensitive Skin | 8.36 | 4.71 | 13.06 |
| 20627 | Sunlight HDISH LIQ 12X950ML | 7.69 | 5.96 | 13.65 |
| 20635 | Sunlight HDISH LIQ 9X1.5L | 8.98 | 7.04 | 16.03 |
| 20643 | Sunlight HDISH Lemon 4X3.6L Case Pak | 9.01 | 7.50 | 16.50 |
| 20648 | Sunlight HD Antibact 12X750ML | 7.14 | 4.70 | 11.84 |
| 20649 | Sunlight HD Antibac 6X3.0L Tray | 13.13 | 9.81 | 22.94 |
| 20650 | Sunlight HD AB 6X3.0L case | 13.05 | 9.81 | 22.85 |
| 13701 | Sun MDISH PDR 10X1.4KG | 9.50 | 2.93 | 12.43 |
| 13702 | Sun MDISH PDR 8X1.8KG | 9.21 | 2.99 | 12.20 |
| 13703 | Sun MDISH PDR 6X3KG | 11.21 | 3.71 | 14.92 |

(1)    Material costs are subject to change based on the current costs of raw materials and packaging materials as provided in this Annex B.

## FEES FOR SUNLIGHT, FINAL TOUCH AND NIAGARA

| General Expense Category | Charge Methodology | Monthly Charge (000's omitted) |
|---|---|---|
| Trade Promotions/Sales Deductions | Direct | Actual |
| Third-Party Manufacturing Costs | Direct* | Per Annex E |
| Production Cost | Direct | Per Annex E |
| Dies & Molds | Direct | Actual |
| Inventory Revaluation | Direct | Actual |
| Distribution | Allocated based on pallet storage square footage and pallet through put (approx. 4.9% of NPS) | Actual |
| Buying and Planning | 0.80% of NPS | Actual |
| Supply Support | 1.7% of NPS | Actual |
| Obsolete Goods/Spoils | Direct | Actual |
| Freight | Direct per shipping weight | Actual |
| Material Price Variances/Rebates | Direct | Actual |
| Advertising/Consumer Promotion | Direct | Actual |
| Development | Direct | $80 |
| **Overheads:** | | |
| Finance/IT-GIO | 1.60% of NPS | Actual |
| Customer Service | 0.50% of NPS | Actual |
| Selling (includes brokerage) | 3.00% of NPS | Actual |
| Marketing | 0.40% of NPS | Actual |

There shall be a $25,000 per month charge for Finance/General Unilever/Bestfoods services for Rit. Purchaser shall be responsible for finance contractors who prepare Rit/Niagara GAAP Financials.

Dollar amounts above are in US dollars.

NPS is defined as Net Proceeds of Sales in Unilever management accounting.

* Pricing on products co-packed by third parties will be charged to Purchaser at manufacturer's negotiated prices.

ANNEX C-1

Distribution
Buying and Planning
Supply Support
Development
Finance/IT-GIO
Customer Service
Selling (includes brokerage) (but only to the extent that Seller has consented in its sole
discretion to provide such services during the applicable period)
Marketing

ANNEX D

## RECONCILIATION STATEMENT

A.  Plus:  Accounts Receivable Collected (Gross)                                          $ _____

B.  Less: Deductions or discounts taken by customers that are
    specifically identified to the Businesses or that can be reasonably
    apportioned to the Businesses on a pro rata basis[1]

    1.  Cash discounts                                               $ _____

    2.  Breakage and spoilage                                        $ _____

    3.  Returns                                                      $ _____

    4.  Trade promotions for Products shipped after the Closing      $ _____

    Subtotal                                                                                   $ _____

C.  Less:  Cash payments made that are specifically identifiable to the
    Businesses or that can be reasonably apportioned to the Businesses
    on a pro rata basis

    1.  Raw materials for third party manufacturers                  $ _____

    2.  Packaging supplies for third party manufacturers             $ _____

    3.  Other goods and services                                     $ _____

    4.  Third-party tolling charges                                  $ _____

    5.  Transportation from production facilities to distribution points   $ _____

    6.  Warehousing charges                                          $ _____

    7.  Transportation to customer                                   $ _____

    8.  Trade promotions                                             $ _____

    9.  Consumer promotions                                          $ _____

    10. Other direct marketing                                       $ _____

    11. Brokerage commissions and incentives                         $ _____

    Subtotal                                                                                   $ _____

D.  Less: Fees (as defined in the Agreement)                                           $ _____

E.  Less:  Seller cash misdirected to Purchaser                     $ _____

    Plus:  Purchaser cash misdirected to Seller                    $ _____

    Subtotal                                                                                   $ _____

Total.   NET DUE FROM(/DUE TO) UNILEVER                                                $ _____

---

[1] There may be deductions or cash payments related to the Businesses other than those listed, which
deductions or cash payments shall be specifically described on the particular Reconciliation Statement to
which they relate. Such deductions or cash payments shall be consistent with the Asset Purchase
Agreement.

ANNEX E

## Product Pricing

### Final Touch

Amounts in US Dollars

| Material # | Item Description | Raw (1) | Pkg (1) | Total Materials | Variable Mfg | Fixed Mfg | Bought In Products (2) | Total Cost |
|---|---|---|---|---|---|---|---|---|
| 125032 | Final Touch FSS 12 20 CT | | | | | | 3.62 | 3.62 |
| 125345 | Final Touch FSS $1.89 PP 12 40 CT | | | | | | 6.64 | 6.64 |
| 158264 | Final Touch FSL 5 Cup 64 OZ | 1.31 | 4.16 | 5.47 | | | 1.00 | 6.47 |
| 158280 | Final Touch FSS 9 64 OZ | 1.23 | 3.55 | 4.78 | 0.21 | 1.06 | | 6.05 |
| 158300 | Final Touch UL 20OZ/12 $1.99PP | | | | | | | 6.74 |
| 158320 | Final Touch FSL .5 Cup 4 120 OZ | 1.04 | 2.21 | 3.25 | | | 1.35 | 4.60 |
| 158328 | Final Touch FSS 4 120 OZ | 1.04 | 2.69 | 3.73 | | | 1.29 | 5.02 |
| 158350 | Final Touch FSL Refill 6 40 LD | | | | | | | 6.50 |
| 158360 | Final Touch FSL Refill $3.49PP 6 40 LD | | | | | | | 6.50 |

### USA Sunlight

Amounts in US Dollars

| Material # | Item Description | Raw (1) | Pkg (1) | Total Materials | Bought In Products(2) | Total Cost |
|---|---|---|---|---|---|---|
| 143005 | Sunlight LDL Mild&Gentle 20 19z Dollar Gen | 2.07 | 4.21 | 6.28 | 1.50 | 7.78 |
| 143014 | Sunlight White 20 19 oz | 4.99 | 2.29 | 7.28 | 1.50 | 8.78 |
| 143094 | SNLT LQ 20 19 oz | 2.56 | 3.49 | 6.05 | 1.47 | 7.52 |
| 143100 | Sunlight White Ultra 12 28 oz | 3.88 | 1.91 | 5.79 | 1.22 | 7.01 |
| 143116 | Sunlight LDL Pump 12 16 oz | 1.87 | 4.08 | 5.95 | 2.00 | 7.95 |
| 143117 | SNL LDL UL Pump 16oz/12 HOLDAY | | | | | 8.41 |
| 143124 | ULTRA SNLT LQ AB 9 42.7 oz | | | | | 3.97 |
| 143126 | Sunlight LDL AB Pump 12 16oz | 2.11 | 3.99 | 6.10 | 2.00 | 8.10 |
| 143200 | Sunlight LDL 20 14.7 oz | 2.86 | 4.05 | 6.91 | 1.39 | 8.30 |
| 143205 | Sunlight Light Duty Liquid 12 28 oz | 3.59 | 2.77 | 6.36 | 1.22 | 7.58 |
| 143214 | Sunlight LDL UL Apple 14.7/20 ND | 2.92 | 4.12 | 7.04 | 1.39 | 8.43 |
| 143225 | Sunlight LDL Ul AB 20 14.7 oz | 3.23 | 2.93 | 6.15 | 1.39 | 7.54 |
| 143227 | Sunlight LDL Anti-Bacterial 12 28oz | 3.69 | 2.60 | 6.29 | 1.22 | 7.51 |
| 143242 | SNLT LQ STD APP 9 42oz | 2.60 | 3.31 | 5.91 | 1.13 | 7.04 |
| 143247 | SNLT LQ 20 19oz | 2.42 | 5.02 | 7.44 | 1.50 | 8.94 |
| 143255 | Sunlight LDL Standard Density 9 42oz | 2.45 | 3.35 | 5.80 | 1.13 | 6.93 |

Amounts in US Dollars

| Material # | Item Description | Raw (1) | Pkg (1) | Total Materials | Bought In Products(2) | Total Cost |
|---|---|---|---|---|---|---|
| 143328 | Sunlight LDL UL Apple 28/12 ND RSC | 3.40 | 3.06 | 6.46 | 1.22 | 7.68 |
| 143419 | Sunlight LDL SD Apple 20 19oz | 2.61 | 5.05 | 7.66 | 1.50 | 9.16 |
| 146112 | Sunlight Tablets 12 15 CT | | | | | 8.32 |
| 146126 | Sunlight Tablets 8 26 CT | | | | | 9.18 |
| 146512 | Sunlight Tablets 8 30 CT | | | | | 11.44 |
| 147020 | Sunlight ADP Lemon 60 15lb. Pail PDM | 11.67 | | 11.67 | 277.34 | 289.00 |
| 147045 | Sunlight ADP 10 45 oz | 0.37 | 1.19 | 1.56 | 5.51 | 7.07 |
| 147061 | Sunlight ADP 8 60 oz | 0.41 | 1.38 | 1.79 | 5.93 | 7.71 |
| 147076 | Sunlight ADP 8 75 oz | 0.50 | 1.52 | 2.02 | 6.52 | 8.54 |
| 147086 | Sunlight ADP Lemon 8 85oz Bonus | 0.55 | 1.76 | 2.31 | 6.66 | 8.97 |
| 147087 | Sunlight ADP 4 110 oz | 0.36 | 1.20 | 1.57 | 5.39 | 6.96 |
| 147090 | Sunlight ADP Fresh Flowers 8 85 oz Bonus | 0.13 | 1.66 | 1.79 | 7.70 | 9.49 |
| 147159 | Sunlight ADP Fresh Flowers 8 75 oz | 0.61 | 1.47 | 2.09 | 6.76 | 8.85 |
| 147295 | Sunlight ADP $2.49PP 10 45 oz | 0.37 | 1.30 | 1.68 | 5.29 | 6.97 |
| 147300 | Sunlight ADP $2.99PP 8 60 oz | 0.40 | 1.35 | 1.75 | 5.75 | 7.50 |
| 147356 | Sunlight ADP Fresh Flowers 10 45 oz | 0.46 | 1.19 | 1.65 | 5.51 | 7.15 |
| 147380 | Sunlight ADP $3.79PP 8 75 oz | 0.50 | 1.42 | 1.92 | 6.77 | 8.69 |
| 165123 | Sunlight ADG Fresh Flowers 6 85 oz | 3.52 | 3.27 | 6.78 | 0.85 | 7.63 |
| 165311 | Sunlight ADG Fresh Flowers 9 50 oz | 3.09 | 2.45 | 5.55 | 1.11 | 6.66 |
| 165449 | Sunlight ADG Lemon 9 50 oz | 3.09 | 2.48 | 5.56 | 1.11 | 6.67 |
| 165455 | Sunlight ADG Lemon $2.49PP 9 50 oz | 3.09 | 2.48 | 5.56 | 1.11 | 6.67 |
| 165461 | Sunlight ADG Lemon 6 65 oz | 2.67 | 1.75 | 4.42 | 0.78 | 5.20 |
| 165464 | Sunlight ADG Lemon $2.99PP 6 65 oz | 2.67 | 1.92 | 4.59 | 0.78 | 5.37 |
| 165481 | Sunlight Automatic Dish Gel 6 85 oz | 3.50 | 2.32 | 5.82 | 0.85 | 6.67 |
| 165486 | Sunlight Automatic Dish Gel $3.79PP 6 85 oz | 3.49 | 3.30 | 6.79 | 0.85 | 7.64 |
| 165520 | Sunlight Automatic Dish Gel 4 128 oz | 3.52 | 2.82 | 6.34 | 1.02 | 7.36 |
| 165554 | Sunlight Automatic Dish Gel 208 150 oz | | | | | 208.03 |

(1) All raw materials and packaging materials costs are subject to change based on the then current costs of raw materials and packaging materials.
(2) Bought in Products is the toll fee charged by the manufacturer. The Brought in Product charge is subject to change based on the manufacturer's then current toll fee.

# EXHIBIT B

# PART 1

*Q3 2004 + Oct 2004*
*Aprl 12431500*


Unilever

**DETAILED LIST OF CHARGES TO PHOENIX**
**DEBIT NOTE #:** *D04-275.*

UNILEVER CANADA
HPC DIVISION (3088)
160 Bloor Street East, Suite 1500
Toronto ON M4W 3R2

DATE:    30-May-05

| Type of Charge | Charge Initiated by | DESCRIPTION | GL acct | | AMOUNT |
|---|---|---|---|---|---|
| Purchase Price Variance | S. Choudry | Korex Purchase Price Variance - July | 12109135 - 170016 | CAD | $4,281.00 |
| | | Korex Purchase Price Variance - August | 12109135 - 170016 | CAD | $56,264.00 |
| | | Korex Purchase Price Variance - September | 12109135 - 170016 | CAD | $44,451.00 |
| | | Korex Purchase Price Variance - October | 12109135 - 170016 | CAD | $44,581.68 |
| Inventory Revaluation | S. Choudry | Korex July Inventory Reval - RawPkg/WIP | 12109135 - 170016 | CAD | ($31,144.00) |
| | | Korex July Inventory Reval - Finished Goods | 12109135 - 170016 | CAD | ($9,730) |
| | | Korex October Inventory Reval - RawPkg/WIP | 12109135 - 170016 | CAD | (6,953.01) |
| | | Korex October Inventory Reval - Finished Goods | 12109135 - 170016 | CAD | (9,106.15) |
| Rebates | T. Taisue | Rebate from Rhodia (Cocamidopropyl Betaine) | 12109135 - 170016 | CAD | ($14,804) |
| Service Fee | L. Home | Monthly Service Fee - July - October ($20,000 CAD per month) | 51420500 - 33058 | CAD | $80,000.00 |
| Warehousing Costs | J. Gu | | | CAD | $0 |
| Obsolete Inventory | A. Sarr | | | CAD | $0 |
| Miscellaneous/Other | L/ Home/C. Roberts | Research & Development: July - October | 42004500 - 33207 | CAD | $100,000.00 |
| | | | SUB TOTAL | CAD | $257,750.52 |
| | | | TOTAL | CAD | $257,750.52 |



Unilever

*- Q4 20AY (except Ocr on Q3 20AY)*

*- AY 133DNov*

**DETAILED LIST OF CHARGES TO PHOENIX**
**DEBIT NOTE #:**

**UNILEVER CANADA**
**HPC DIVISION (3085)**
160 Bloor Street East; Suite 1500
Toronto ON M4W 3R2

DATE:    09-Aug-05

CHARGE TO:

Phoenix Inc.
3 Kent Road
Scarsdale, NY 10583

Attention:                        Brendan Holden, VP Supply Chain
Intercompany IP/IR number:

| Type of Charge | Charge Initiated by | DESCRIPTION | GL acct | | AMOUNT |
|---|---|---|---|---|---|
| Purchase Price Variance | S. Choudry | Korex Purchase Price Variance - November 2004 | 12109135 - 170016 | CAD | $113,571.00 |
| | | Korex Purchase Price Variance - December 2004 | 12109135 - 170016 | CAD | $57,035.00 |
| | | 96493 Magnesium Sulfate Adj - Purchase Price Variance October 2004 | 12109135 - 170016 | CAD | $1,864.00 |
| Inventory Revaluation | S. Choudry | | | CAD | $0.00 |
| Rebates | T. Taisue | | | CAD | $0 |
| Service Fee | L. Horne | Monthly Service Fee - November & December ($20,000 CAD per month) | 51420500 - 33056 | CAD | $40,000.00 |
| Warehousing Costs | J. Gu | Pallets Recharged - July 2004 to Dec 2004 | 12109135- 170016 | CAD | $25,973 |
| Obsolete Inventory | A. Sarr | | | CAD | $0 |
| Miscellaneous/Other | L/ Horne/C. Roberts | Research & Development November & December | 42004500 - 33207 | CAD | $50,000.00 |
| | S. Choudry | Charge back for mold repair charges from Plastic Moulders | 12109135 - 170016 | CAD | 29,211.84 |
| | S. Choudry | Credit for Sunlight Hand dish 4x3.6L Case Pack | 12109135 - 170016 | CAD | (769.19) |

| DEBIT NOTE #: | | PAYMENT INSTRUCTIONS: | | | |
|---|---|---|---|---|---|
| | | To:    Unilever Canada (HPC) - a division of Unilever Canada Inc. | SUB TOTAL | CAD | $316,885.50 |
| | | 160 Bloor St. West, Suite 1500 | | | |
| | | Toronto, ON | TOTAL | CAD | $316,885.50 |
| | | Canada M4W 3R2 | | | |
| | | USD: Bank of Montreal - Swift code: BOFMCAT2     Account: 0002-4503-832 | | | |
| | | CDN: Bank of Montreal - Swift code: BOFMCAT2     Account: 0002-1065-436 | | | |

| PREPARED BY: | APPROVED BY:    SIGNATURE: | INITIATED BY: |
|---|---|---|
| R Dang | Les Horne | R Dang |



Home & Personal Care Division
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P:1-800-293-4947   F:1-800-387-5119

*Unilever*

D-U-N-S  201692274
GST REG# 133867648
QST REG# 1013908903

**REMIT TO / FAIRE REMISE A**
Unilever Canada HPC - T9945
PO Box 9900   Postal Station A
Toronto ON M5W 2J2 CA

**SHIP TO / EXPEDIE A**
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221  USA

# CREDIT NOTE

| INVOICE NO. NO DE FACTURE | INVOICED-FACTURE. YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | | | BA. NO. | PAGE |
|---|---|---|---|---|---|---|---|
| 90981002 | 2005/12/19 | | | | | 60053858 | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR. | SHIPPED FROM-EXPEDIE DE | | | | VIA | | |
|---|---|---|---|---|---|---|---|
| | LP Schenker Dist. Center | | | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P./ DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD QUANT. | QUANT.SHIP. QUANT.LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 358376.10 | 0.00 | 358376.10 | |

Att:  Jeannie Brown

Re:  Q1 2005 Billing

As per attached

| DIV. TERR | CUST.# # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net30 | 1 | 0.00 | 358376.10 | 0.00 | 358376.10 |

COPY

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..



**Home & Personal Care Division**
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P:1-800-293-4947  F:1-800-387-5119

D-U-N-S  201692274
GST REG# 133867648
QST REG# 1013908903

**REMIT TO / FAIRE REMISE A**
Unilever Canada HPC - T9945
PO Box 9900    Postal Station A
Toronto ON M5W 2J2 CA

**SHIP TO / EXPEDIE A**
Company        .
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221   USA

**CREDIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICED-FACTURE YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | | | | BA. NO. | PAGE |
|---|---|---|---|---|---|---|---|---|
| 90978575 | 2005/12/15 | | | | | | 60053820 | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR. | SHIPPED FROM-EXPÉDIE DE | | | | VIA | | |
|---|---|---|---|---|---|---|---|
| | LP Schenker Dist. Center | | | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD QUANT. | QUANT.SHIP. QUANT.LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 78410.88 | 0.00 | 78410.88 | |
| | | | | | | | | |
| Att:  Jeannie Brown | | | | | | | | |
| | | | | | | | | |
| Re:  Q2 2005 Billing | | | | | | | | |
| | | | | | | | | |
| -as per attached details | | | | | | | | |

| DIV. TERR | CUST.# # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP. TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | 2%10 Net30 | 1 | 0.00 | 78410.88 | 0.00 | 78410.88 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE, CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE, LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ÊTRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..



COPY



Home & Personal Care Division
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P:1-800-293-4947   F:1-800-387-5119

D-U-N-S  201692274
GST REG# 133867648
QST REG# 1013908903

REMIT TO / FAIRE REMISE A
Unilever Canada HPC - T9945
PO Box 9900   Postal Station A
Toronto ON M5W 2J2 CA



SHIP TO / EXPEDIE A
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221  USA

# DEBIT NOTE

| INVOICE NO. / NO DE FACTURE | INVOICED-FACTURE YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | | B.L. NO. | PAGE |
|---|---|---|---|---|---|---|
| 90981092 | 2005/12/19 | | | | 70014651 | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR. | SHIPPED FROM-EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | LP Schenker Dist. Center | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD QUANT. | QUANT.SHIP. QUANT.LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 71268.93 | 0.00 | 71268.93 | |

Att:  Jeannie Brown

Re:  Q3 2005 Billing

As per attached

| DIV. TERR. | CUST.# # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP. TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net30 | 1 | 0.00 | 71268.93 | 0.00 | 71268.93 |

COPY

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES. MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..

*Unilever*

P:1-800-293-4947  F:1-800-387-5119

D-U-N-S  201692274
GST REG# 133867648
QST REG# 1013908903

PO Box 9900    Postal Station A
Toronto ON M5W 2J2 CA

SHIP TO / EXPEDIE A
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

_LD TO / VENDU A
PHOENIX BRANDS
*2601 FIRETONE CIRCLE E.*
INDIANAPOLIS IN  46221  USA

**DEBIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICED-FACTURE YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | | | | | BL. NO. | PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 91085356 | 2006/09/01 | | | | | | | 70015354 | 1 |
| **SHIPPED-EXPEDIE YR-AN MO. DY-JR.** | | **SHIPPED FROM-EXPEDIE DE** | | | | **VIA** | | | |
| | | LP Schenker Dist. Center | | | | | | | CAD |
| **DESCRIPTION** | **VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P.: DU VENDEUR/CODE DUE CLIENT** | **U/M** | **QUANT. ORD. QUANT.** | **QUANT. SHIP. QUANT. LIVRE** | **UNIT PRICE PRIX UNITE** | **UNIT ALLOW ALLOC.UNIT** | **AMOUNT MONTANT** | **TAX GST / PROV** | |
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 72049.06 | 0.00 | 72049.06 | | |

Att:  Alice Wu

Re:  Q4 2005 Billing

| DIV. TERR | CUST. # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD. GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net20 | 1 | 0.00 | 72049.06 | 0.00 | 72049.06 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..

Home & Personal Care Division
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P:1-800-293-4947  F:1-800-387-5119

D-U-N-S 201692274
GST REG# 133867648
QST REG# 1013908903

**REMIT TO / FAIRE REMISE A**
Unilever Canada HPC - T9945
PO Box 9900   Postal Station A
Toronto ON M5W 2J2 CA

**SHIP TO / EXPEDIE A**
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

**SOLD TO / VENDU A**
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221   USA

## CREDIT NOTE

| INVOICE NO. NO DE FACTURE | INVOICED-FACTURE YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | B/L NO. | PAGE |
|---|---|---|---|---|
| 91085352 | 2006/09/01 | | 60057395 | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR. | SHIPPED FROM-EXPEDIE DE. | | VIA | |
|---|---|---|---|---|
| | LP Schenker Dist. Center | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD QUANT. | QUANT.SHIP QUANT.LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 17867.45 | 0.00 | 17867.45 | |

Att:  Alice Wu

Re:  Q1 2006 Billing

| DIV. TERR | CUST.# # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD. GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net20 | 1 | 0.00 | 17867.45 | 0.00 | 17867.45 |

Y

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..

Unilever

P:1-800-293-4947  F:1-800-387-5119

D-U-N-S  201692274
GST REG# 133867648
QST REG# 1013908903

Unilever Canada TT S - 19949
PO Box 9900  Postal Station A
Toronto ON M5W 2J2 CA

SHIP TO / EXPEDIE A
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
1260 FORT WAYNE CIRCLE E.
INDIANAPOLIS IN  46204  USA

**DEBIT NOTE**

| INVOICE NO.<br>NO DE FACTURE | INVOICED-FACTURE<br>YR-AN. MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | B/L NO. | PAGE |
|---|---|---|---|---|---|
| 91085355 | 2006/09/01 | | | 70015353 | 1 |

| SHIPPED-EXPEDIE<br>YR-AN. MO. DY-JR. | SHIPPED FROM-EXPEDIE DE | VIA | |
|---|---|---|---|
| | LP Schenker Dist. Center | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE<br>CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD<br>QUANT. | QUANT.SHIP<br>QUANT.LIVRE | UNIT PRICE<br>PRIX UNITE | UNIT ALLOW<br>ALLOC.UNIT | AMOUNT<br>MONTANT | TAX<br>GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 17418.71 | 0.00 | 17418.71 | |

Att:  Alic Wu

Re:  Q2 2006 Billing

| DIV.<br>ERR. | CUST. #<br># DE CLIENT | GROSS SHIP.WGHT.<br>POIDS BRUT | TERMS-TERMES | TOTAL SHIP<br>TTL EXPEDIE | DISCOUNT<br>ESCOMPTE | PRODUCT AMOUNT<br>MONTANT MARCH. | PROD.<br>GST / PROV | INVOICE TOTAL<br>MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net20 | 1 | 0.00 | 17418.71 | 0.00 | 17418.71 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S
WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND
SIGNATURE OF CARRIER'S AGENT.

FINAL  IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO
DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES,
MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET
ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE
TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..



Unilever Canada, a division of Unilever Canada Inc.
160 Bloor St. East, Suite 1500
Toronto ON M4W 3R2
P:1-800-293-4947  F:1-800-387-5119

Unilever Canada HPC - T9945
PO Box 9900   Postal Station A
Toronto ON M5W 2J2 CA

D-U-N-S  201692274
GST REG# 133857646
QST REG# 1013908903

SHIP TO / EXPEDIE A
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
2601 FORTUNE CIRCLE EAST, STE 102B
INDIANAPOLIS IN  46221  USA

**DEBIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICED-FACTURE YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | B/L NO. | PAGE |
|---|---|---|---|---|---|
| 91122330 | 2006/11/28 | | | 70015548 | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR. | SHIPPED FROM-EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | LP Schenker Dist. Center | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD QUANT. | QUANT.SHIP. QUANT.LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 28322.17 | 0.00 | 28322.17 | |

Att:  Alice Wu

Q3 2006 billing

| DIV. TERR | CUST.# # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net20 | 1 | 0.00 | 28322.17 | 0.00 | 28322.17 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE, CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSIBLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, CE TRIAGE DES MERCHANDISES, ETC.

ORIGINAL


Unilever

Home & Personal Care Division
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P:1-800-293-4947  F:1-800-387-5119

D-U-N-S  201692274
GST REG# 133867648
QST REG# 1013908903

REMIT TO / FAIRE REMISE A

Unilever Canada HPC - T9945
PO Box 9900    Postal Station A
Toronto ON M5W 2J2 CA

SHIP TO / EXPEDIE A

Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
2601 FORTUNE CIRCLE C, STE 102B
INDIANAPOLIS IN  46241 USA

**DEBIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICED-FACTURE YR-AN MO. DY-JR. | CUST. ORDER-COMMANDE DUE CLIENT | | B/L NO. | PAGE |
|---|---|---|---|---|---|
| 91315550 | 2008/03/12 | | | 70016797 | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR. | SHIPPED FROM-EXPEDIE DE | | VIA | | |
|---|---|---|---|---|---|
| | LP Schenker Dist. Center | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT.ORD QUANT. | QUANT.SHIP. QUANT.LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES: OTHER | | EA | 1 | 1 | 336887.68 | 0.00 | 336887.68 | |
| ATTN: Jeannie Brown | | | | | | | | |
| Q4 2006 to Q4 2007 Billings | | | | | | | | |
| Details attached | | | | | | | | |

| DIV. TERR | CUST.# # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | 2%10 Net30 | 1 | 0.00 | 336887.68 | 0.00 | 336887.68 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DECHARGEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES ETC..

ORIGINAL

# EXHIBIT B

# PART 2



Unilever Canada (Foods)
A division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P: 1-800-387-8691  F: 1-800-387-5119

D-U-N-S 201693835
GST REG# 133867648
GST REG# 1009639369

**REMIT TO / FAIRE REMISE A**
Unilever Canada Foods-T8091
PO Box 8091  Postal Station A
Toronto ON M5W 3W5 CA

**SHIP TO / EXPEDIE A**
Company
PHOENIX BRAND LLC
300 ATLANTIC STREET
STAMFORD CT 06901
USA

SOLD TO / VENDU A
Phoenix Brand LLC
300 Atlantic Street
Stamford CT 06901 USA

**DEBIT NOTE**

| INVOICE NO. NO. DE FACTURE | INVOICE/FACTURE YR AN MO. DY JR | CUST ORDER/COMMANDE DUE CLIENT | | | | BL NO. | PAGE |
|---|---|---|---|---|---|---|---|
| 90873204 | 2005/04/20 | | | | | | 1 |

| SHIPPED/EXPEDIE YR AN MO. DY JR | SHIPPED FROM/EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | UM | QUANT ORD/QUANT QUANT | SHIP QUANT/LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC/UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC RECEIVABLES/OTHERS | 00000-0001050 | EA | 1 | 1 | 551841.68 | 0.00 | 551841.68 | |
| | | | | | | | | |
| Final inventory transfer to | | | | | | | | |
| Phoenix | | | | | | | | |
| (amount owed for purchases in | | | | | | | | |
| excess of COGS) | | | | | | | | |
| (charged on monthly Cash Rec's | | | | | | | | |
| in 2004) | | | | | | | | |

*(handwritten, circled)* TOTAL CHARGE IS $1,103,683.17, SPLIT BETWEEN INV. 90873203 AND 90873204

| DIV. TERR | CUST # # DE CLIENT | GROSS SHIP WGHT POIDS BRUT | TERMS/TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 108217 | 0.000 | Net30 | | 0.00 | | | 551841.68 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO UNILEVER CANADA INC. WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY, CHARGES UNILEVER CANADA INC. ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO H DELIVERIES, SORTING, SEGREGATION, ETC.

ADRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE UNILEVER CANADA INC., DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, UNILEVER CANADA INC. NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.



**Unilever**

A division of Unilever Canada Inc,
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P: 1-800-387-8691   F: 1-800-387-6119

D-U-N-S  201693835
GST REG# 133867648
QST REG# 1009539369

REMIT TO / FAIRE REMISE A
Unilever Canada Foods-T8091
PO Box 8091, Postal Station A
Toronto ON M5W 3W5 CA

SOLD TO / VENDU A
Phoenix Brand LLC
300 Atlantic Street
Stamford CT  06901  USA

SHIP TO / EXPEDIE A
Company
PHOENIX BRAND LLC
300 ATLANTIC STREET
STAMFORD CT  06901
USA

**DEBIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICED FACTURE YR.AN.MO/DY.JR | CUST. ORDER-COMMANDE DUE CLIENT | | | | | | | BAT No. | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| 90878203 | 2005/04/20 | | | | | | | | | 1 |
| SHIPPED/EXPEDIE YR.AN MO/DY.JR | | SHIPPED FROM/EXPEDIE DE | | | | | VIA | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE/ CONTENANT/CJ.T.P DU VENDEUR/CODE DUE CLIENT | U/M | QUANT ORD QUANT | QUANT SHIP QUANT LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC/UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC RECEIVABLES:OTHERS | 00000-0001050 | EA | 1 | 1 | 551841.59 | 0,00 | 551841.59 | |
| | | | | | | | | |
| Final inventory transfer to | | | | | | | | |
| Phoenix | | | | | | | | |
| (amount owed for purchases | | | | | | | | |
| in excess of COGS) | | | | | | | | |
| (charged on monthly Cash Rec's | | | | | | | | |
| in 2004) | | | | | | | | |

| DIV. TERR | CUST. # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106217 | 0.000 | Net30 | | 0.00 | | | 551841.59 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO UNILEVER CANADA INC. WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES UNILEVER CANADA INC. ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE ADRESSEES AUPRES DE UNILEVER CANADA INC., DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, UNILEVER CANADA INC. NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.

ORIGINAL



Unilever

160 Bloor St East, Suite 1600
Toronto ON M4W 3R2

P: 1-800-387-8691  F: 1-800-387-5119

D-U-N-S 201693835
GST REG# 133867648
QST REG# 1009639359

Unilever Canada Foods-T8091
PO Box 8091  Postal Station A
Toronto ON M5W 3W5 CA

SHIP TO / EXPEDIE A

SOLD TO / VENDU A
Phoenix Brand LLC
300 Atlantic Street
Stamford CT  06901  USA

Company
PHOENIX BRAND LLC
300 ATLANTIC STREET
STAMFORD CT  06901
USA

## DEBIT NOTE

| INVOICE NO. NO DE FACTURE | INVOICE / FACTURE YR/AN MO. DY JR | CUST. ORDER-COMMANDE-DUE CLIENT | | BR. NO. | PAGE |
|---|---|---|---|---|---|
| 90872449 | 2005/04/19 | | | | 1 |

| SHIPPED/EXPEDIE YR/AN MO. DY JR | SHIPPED FROM-EXPEDIE DE | VIA | |
|---|---|---|---|
| | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/U.C.P. DU VENDEUR/CODE/DUE CLIENT | U/M UN | QUANT. ORD QUANT. TD/AN/LIVRE | QUANT. SHIP QUANT. D/A/LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOUANCE | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES:OTHERS | 00000:0001050 | EA | 1 | 1 | 596131.01 | 0.00 | 596131.01 | |

Final amount owed on 2004
YTD Cash Rec.

| DIV. TERR | CUST # # DE CLIENT | GROSS SHIP WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 108217 | 0.000 | Net30 | | 0.00 | | | 596131.01 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO UNILEVER CANADA INC. WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES, UNILEVER CANADA INC. ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE UNILEVER CANADA INC. DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, UNILEVER CANADA INC. NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.

ORIGINAL



A division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

**Unilever**

P: 1-800-387-8691  F: 1-800-387-5119

D-U-N-S 201693836
GST REG# 133867648
QST REG# 1009639369

REMIT TO / FAIRE REMISE A
Unilever Canada Foods-T8091
PO Box 8091  Postal Station A
Toronto ON M5W 3W6 CA

SHIP TO / EXPEDIE A
Company
PHOENIX BRAND LLC
300 ATLANTIC STREET
STAMFORD CT 06901
USA

*317-556 36 39*

SOLD TO / VENDU A
Phoenix Brand LLC
300 Atlantic Street
Stamford CT  06901  USA

**DEBIT NOTE**

*JE ANNE BROWN*

| INVOICE NO NO DE FACTURE | INVOICED/FACTURE YR AN MO DY JR | CUST. ORDER/COMMANDE DUE CLIENT | | | BX NO | PAGE |
|---|---|---|---|---|---|---|
| 90876937 | 2005/04/26 | | | | | 1 |

| SHIPPED EXPEDIE YR AN MO DY JR | SHIPPED FROM/EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M U.M. | QUANT ORD QUANT | QUANT SHIP QUANT LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC/UNIT | AMOUNT MONTANT | TAX GST T PROV |
|---|---|---|---|---|---|---|---|---|
| MISC RECEIVABLES OTHERS | 00000-0001050 | EA | 1 | 1 | 105135.96 | 0.00 | 105135.96 | |
| | | | | | | | | |
| Att: Accounts Payable | | | | | | | | |
| | | | | | | | | |
| Outstanding Sunlight Handdish/ | | | | | | | | |
| Machine Dish deductions from 2004 | | | | | | | | |
| | | | | | | | | |
| Reference #D04049007 Shoppers | | | | | | | | |
| Drug Mart      $66,454.40 | | | | | | | | |
| | | | | | | | | |
| Reference #D00508825 Shoppers | | | | | | | | |
| Drug Mart      $42,803.50 | | | | | | | | |
| | | | | | | | | |
| GST @ 7%   $6,878.06 | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Address we have on file is as | | | | | | | | |
| per above | | | | | | | | |

| DIV TERM | CUST # # DE CLIENT | GROSS SHIP WGHT POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106217 | 0.000 | Net30 | | 0.00 | | | 105135.96 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO UNILEVER CANADA INC. WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE/RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

**ORIGINAL**

IN PREPARING DELIVERY CHARGES UNILEVER CANADA INC. ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADRESSEZ VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE UNILEVER CANADA INC., DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, UNILEVER CANADA INC. NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.

# EXHIBIT B

# PART 3



A division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P: 1-800-387-8691  F: 1-800-387-6119

D-U-N-S  201693835
GST REG# 133867648
QST REG# 1009639359

REMIT TO / PAYE REMISE A
Unilever Canada Foods-T8091
PO Box 8091  Postal Station A
Toronto ON M5W 3W5 CA

SHIP TO / EXPEDIE A
Company
PHOENIX BRAND LLC
300 ATLANTIC STREET
STAMFORD CT  06901
USA

SOLD TO / VENDU A
Phoenix Brand LLC
300 Atlantic Street
Stamford CT  06901  USA

**DEBIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICE / FACTURE YR-AN MO. DY-JR | CUST. ORDER-COMMANDE DUE CLIENT | | | | B/L NO. | PAGE |
|---|---|---|---|---|---|---|---|
| 908774496 | 2005/04/27 | | | | | | 1 |

| SHIPPED-EXPEDIE YR-AN MO. DY-JR | SHIPPED FROM-EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | | | | CAD |

| DESCRIPTION | VENDOR CODE / CASE SIZE / CUSTOMER PROD. CODE CONTENANT / C.U.P. CO-VENDRUN/CODE DUE CLIENT | U/M QUANT | QUANT. ORD QUANT. | QUANT. SHIP QUAN. LIVRE | UNIT PRICE PRIX UNITS | UNIT ALLOW ALLOC.UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC.RECEIVABLES.OTHERS | 00000-0001050 | EA | 1 | 1 | 1,671.77 | 0.00 | 1,671.77 | |

Att: Accounts Payable

Outstanding Sunlight Handdish/
Machine Dish deductions from 2004

Reference #D04052481
Lawtons Drugs   $1,562.40

GST @ 7%   $109.37

| DIV. TERR | CUST. / # DE CLIENT | GROSS SHIP.WGHT. POIDS BRUT | TERMS-TERMES | TOTAL-SHIP TTL-EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 108217 | 0.000 | Net30 | | 0.00 | | | 1,671.77 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO UNILEVER CANADA INC. WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES UNILEVER CANADA INC. ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFEES AUPRES DE UNILEVER CANADA INC., DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, UNILEVER CANADA INC. NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.

ORIGINAL



A division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P: 1-800-387-8691   F: 1-800-387-5119

D-U-N-S  201693836
GST REG# 133867648
QST REG# 1009539359

Unilever Canada Foods T8091

PO Box 8091  Postal Station A
Toronto ON M5W 3W5 CA

SHIP TO / EXPEDIE A
Company
PHOENIX BRAND LLC
300 ATLANTIC STREET
STAMFORD CT  06901
USA

SOLD TO / VENDU A
Phoenix Brand LLC
300 Atlantic Street
Stamford CT  06901  USA

**DEBIT NOTE**

| INVOICE NO. NO. DE FACTURE | INVOICED FACTURE/ YR/AN MO. DY JR. | CUST. ORDER COMMANDE DUE CLIENT | | | B/L NO. | PAGE |
|---|---|---|---|---|---|---|
| 908780060 | 2006/04/27 | | | | | |

| SHIPPED EXPEDIE YR/AN MO. DY/JR | | SHIPPED FROM EXPEDIE DE | | VIA | | |
|---|---|---|---|---|---|---|
| | | | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE/ CONTENANT/C/UR DU VENDEUR/CODE DU CLIENT | UM | QUANT. ORD QUANT. | QUANT. SHIP. QUANT. LIVRE | UNIT PRICE/ PRIX UNIT. | UNIT ALLOW. ALLOC. UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC. RECEIVABLES, OTHERS | 00000-0001050 | EA | 1 | 1 | 16499.40 | 0.00 | 16,499.40 | |

Att:  Accounts Payable

Outstanding Sunlight Handdish/
Machine Dish deductions from 2004

Ref: #D00504794 Costco Wholesale
$5,900.00

Outstanding Sunlight Handdish/
Machine Dish deductions from 2004

Ref: #D00510267 Costco Wholesale
$9,520.00

GST @ 7%   $1,079.40

| DIV. TERR | CUST. # # DE CLIENT | GROSS SHIP WGHT. POIDS BRUT | TERMS TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106217 | 0.000 | Net30 | | 0.00 | | | 16,499.40 |

ORIGINAL

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO UNILEVER CANADA INC. WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP, SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES UNILEVER CANADA INC. ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGÉES, MANQUANTES OU RETOURNÉES DOIVENT ETRE SIGNIFIÉES AUPRÈS DE UNILEVER CANADA INC., DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNÉES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, UNILEVER CANADA INC. NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DÉBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.

# LEVER ❦ PONDS

a Division of Unilever Canada Inc.
160 Bloor St East, Suite 100    701692274
Toronto ON M4S 3W5 GST REG# 133867648
                             GST REG# 1009539959
P:1-800-293-4947  F:1-800-387-5119

**REMIT TO / FAIRE REMISE A**
Unilever Canada Foods-TB091
PO Box 8091  Postal Station A
Toronto ON M5W 3W5 CA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221  USA

**SHIP TO / EXPEDIE A**
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

## DEBIT NOTE

| INVOICE NO. NO DE FACTURE | INVOICED FACTURE YR-AN MO. DY JR | CUST. ORDER-COMMANDE DUE CLIENT | | B/L NO. | PAGE |
|---|---|---|---|---|---|
| 90895506 | 2005/06/03 | | | 70014089 | 1 |

| SHIPPED-EXPEDIE VR-AN MO. DY-JR | SHIPPED FROM-EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | LP Schenker Dist. Center | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE CONTENANT/C.U.P. OU VENDEUR | CUSTOMER PROD. CODE CODE DUE CLIENT | UM | QUANT ORD/QUANT COMD | QUANT SHIP QUANT LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC/UNIF | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|---|
| MISC RECEIVABLES: OTHER | | | EA | 1 | 1 | 1,183.00 | 0.00 | 1,183.00 | |

Outstanding Sunlight Handdish/
Machine Dish deductions from 2004

Référence #D00504865 Northwest
Company

$1,105.61
GST      77.39

| DIV/ TERR. | CUST # # DE CLIENT | GROSS SHIP WGHT POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | TAX GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net30 | | 0.00 | | | 1,183.00 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE, LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..

a Division of Unilever Canada Inc.
100 Bloor St East, Suite 200      201692274
Toronto ON M4S 3W5 GST REG# 133867648
                    QST REG# 1013908903
P:1-800-293-4947  F:1-800-387-5119

Lever Ponds/Unilever Canada-T9945
PO Box 9900   Postal Station A
Toronto ON M6W 2J2 CA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221  USA

SHIP TO / EXPEDIE A
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

**DEBIT NOTE**

| INVOICE NO. NO. DE FACTURE | INVOICE DE FACTURE YR/AN MO. DY/JR | CUST. ORDER COMMANDE DUE CLIENT | | BL NO. | PAGE |
|---|---|---|---|---|---|
| 90974954 | 2005/12/06 | | | 70014622 | 1 |

| SHIPPED EXPEDIE YR/AN MO. DY/JR | | SHIPPED FROM/EXPEDIE DE | | VIA | |
|---|---|---|---|---|---|
| | | LP Schenker Dist. Center | | | CAD. |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/C.U.P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT. ORD. QUAN. | QUANT. SHIP. QUANT. LIVRE | UNIT PRICE PRIX UNITES | UNIT ALLOW ALLOC./UNIT | AMOUNT MONTANT | TAX GST & PROV. |
|---|---|---|---|---|---|---|---|---|
| MISC RECEIVABLES, OTHER | | EA | 1 | | 3600.55 | 0.00 | 3600.55 | |

Att: Jeannie Brown

Sunlight Hand Dish deductions
for 2004

| DIV. TERR | CUST. # DE CLIENT | GROSS SHIP WGHT. POIDS BRUT | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD. GST/. PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net30 | 1 | 0.00 | 3600.55 | 0.00 | 3600.55 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY. TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC.



Home & Personal Care Division
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1500
Toronto ON M4W 3R2

P:1-800-293-4947  F:1-800-387-5119

*Unilever*

D-U-N-S  201692274
GST REG# 193867548
QST REG# 1013908903

**REMIT TO / FAIRE REMISE A**
Unilever Canada HPC - T9945
PO Box 9900   Postal Station A
Toronto ON M5W 2J2 CA

**SHIP TO / EXPEDIE A**
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN  46221  USA

**DEBIT NOTE**

| INVOICE NO. NO DE FACTURE | INVOICED FACTURE YR-MO DY-JR | CUST ORDER COMMANDE DUE CLIENT | DA. NO. | PAGE |
|---|---|---|---|---|
| 91073629 | 2006/08/04 | D06008327 | 70016296 | 1 |

| SHIPPED EXPEDIE YR-MO DY-JR | SHIPPED FROM EXPEDIE DE | | VIA | |
|---|---|---|---|---|
| | LP Schenker Dist. Center | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/U.F. DU VENDEUR/CODE DUE CLIENT | U/M UM | QUANT. ORD QUANT. | QUANT. SHIP QUANT. LIVRE | UNIT PRICE PRIX UNITE | UNIT ALLOW ALLOC UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC. RECEIVABLES, OTHER | | EA | 1 | 1 | 934.69 | 0.00 | 934.69 | |
| GOODS & SERVICES TAX | | EA | 1 | 1 | 60.57 | 0.00 | 60.57 | |

| DIV. TERR | CUST.# # DE CLIENT | GROSS SHIP WGHT. POIDS BRUT. | TERMS-TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD. GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net30 | 2 | 0.00 | 995.26 | 0.00 | 995.26 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, OE TRIAGE DES MERCHANDISES, ETC..

COPY



Home & Personal Care Division
Unilever Canada, a Division of Unilever Canada Inc.
160 Bloor St East, Suite 1600
Toronto ON M4W 3R2

P:1-800-293-4947  F:1-800-387-5119

D-U-N-S: 201692274
GST REG# 133867648
QST REG# 1013908903

**REMIT TO / FAIRE REMISE A**
Unilever Canada HPC - T9945
PO Box 9900   Postal Station A
Toronto ON M6W 2J2 CA

**SHIP TO / EXPEDIE A**
Company
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN 46221
USA

SOLD TO / VENDU A
PHOENIX BRANDS
1437 WEST MORRIS STREET
INDIANAPOLIS IN 46221 USA

**DEBIT NOTE**

| INVOICE NO. / NO DE FACTURE | INVOICED FACTURE YR AN MO DY JR | CUST. ORDER COMMANDE DUE CLIENT | | BA NO. | PAGE |
|---|---|---|---|---|---|
| 91078624 | 2006/08/04 | DO0546425 | | 70015297 | |
| SHIPPED EXPEDIE YR AN MO DY JR | SHIPPED FROM EXPEDIE DE | | VIA | | |
| | LP Schenker Dist. Center | | | | CAD |

| DESCRIPTION | VENDOR CODE/CASE SIZE/CUSTOMER PROD. CODE CONTENANT/CU-P. DU VENDEUR/CODE DUE CLIENT | U/M | QUANT. ORD QUANT. | QUANT. SHIP QUANT. LIVRE | UNIT PRICE PRIX/UNITE | UNIT ALLOW ALLOC/UNIT | AMOUNT MONTANT | TAX GST / PROV |
|---|---|---|---|---|---|---|---|---|
| MISC RECEIVABLES: OTHER | | EA | 1 | 1 | 4617.49 | 0.00 | 4617.49 | |
| Provigo Prior Year Claims on Sunlight Liquid and Machine Dish Detergent. | | | | | | | | |

| DIV. TERR | CUST # DE CLIENT | GROSS SHIP WGHT. POIDS BRUT | TERMS TERMES | TOTAL SHIP TTL EXPEDIE | DISCOUNT ESCOMPTE | PRODUCT AMOUNT MONTANT MARCH. | PROD. GST / PROV | INVOICE TOTAL MONTANT FACTURE |
|---|---|---|---|---|---|---|---|---|
| ZZ | 106231 | 0.000 | Net30 | 1 | 0.00 | 4617.49 | 0.00 | 4617.49 |

REFER TO OUR OFFICE BEFORE RETURNING MERCHANDISE. CLAIMS FOR SHORT, RETURNED OR DAMAGED DELIVERY TO BE MADE TO LEVER POND'S WITHIN 30 DAYS OF DELIVERY, SUPPORTED BY A COPY OF THE CARRIER'S DELIVERY SLIP SHOWING SHORTAGE, RETURNED OR DAMAGED AND SIGNATURE OF CARRIER'S AGENT.

IN PREPARING DELIVERY CHARGES LEVER POND'S ACCEPTS NO LIABILITY FOR ADDITIONAL CHARGES WHICH MAY BE LEVIED BY A CARRIER DUE TO DELAYS IN UNLOADING HIS VEHICLES AT THE BUYER'S PREMISES OR DUE TO REDELIVERIES, SORTING, SEGREGATION, ETC.

ADDRESSEZ-VOUS A NOTRE BUREAU AVANT DE RETOURNER DE LA MERCHANDISE. LES RECLAMATIONS TOUCHANT LES MERCHANDISES ENDOMMAGEES, MANQUANTES OU RETOURNEES DOIVENT ETRE SIGNIFIEES AUPRES DE LEVER POND'S, DANS LES TRENTE JOURS SUIVANT LA LIVRAISON, ET ACCOMPAGNEES D'UNE COPIE DU BORDEREAU DE LIVRAISON DU TRANSPORTEUR.

EN PAYANT D'AVANCE LES FRAIS DE LIVRAISON, LEVER POND'S NE PREND PAS EN CHARGE LES FRAIS SUPPLEMENTAIRES IMPOSABLES PAR LE TRANSPORTEUR SUITE AU RETARD DE DEBARQUEMENT DES MERCHANDISES, D'AJOURNEMENT DE LIVRAISON, DE TRIAGE DES MERCHANDISES, ETC..

COPY